# GILLESPIE et al. v. FEDERAL COMPRESS & WAREHOUSE CO.—265 S. W. (2d) 21.

Western Division, at Jackson.   June 10, 1953.

Petition for Certiorari denied by Supreme Court, December 11, 1953.

478

480

John J. Hooker, of Nashville, and Lowell W. Taylor, of Memphis, for appellants.

Edward M. Lowrance and John R. Stivers, both of Memphis, for Federal Compress.

Lucius E. Burch, Jr., of Memphis, for Whitfield King & Co.

SWEPSTON, J. This is a suit by two minority stockholders against Federal Compress & Warehouse Company, W. L. Taylor individually and as president and chairman of the board of directors, H. H. Merriam as secretary-treasurer, and four of the directors for the purpose of enjoining continuation of the present insurance program relating to cotton belonging to its customers and to recover the insurance premiums paid on same.

The original bill sought a money judgment against W. L. Taylor only for those premiums paid the insurance agency, Whitfield King & Company. This agency was permitted to intervene as a defendant, whereupon by amended bill, a judgment was sought against it also.

The bill was filed in behalf of complainants and all others who might desire to join in. None came in, but later there was a substitution of Lowell W. Taylor as complainant in place of William I. McLain who was acting for Taylor because of the latter's being counsel on the bill and to whom Taylor had transferred a few shares of stock for this purpose.

The hearing was ore tenus and according to the forms of Chancery. The Chancellor denied any relief on the bill and complainants have appealed. Defendants moved to retax costs so as to tax as costs against complainants reasonable fees of counsel for defendants, which motion was overruled and from which a cross appeal is taken.

The pleadings may be epitomized as follows:

The bill alleges that said W. L. Taylor, through the stock owned by himself and family and others he controls, dominates and controls the election of directors and officers, determines and dictates the policies of the Cor-

poration and otherwise exercises substantially exclusive direction and control of all affairs of the same; that it is not authorized by its charter to engage in the insurance business, nor does any law require it as bailee of cotton to carry insurance on same, nor is it liable for loss of same resulting from fire, flood or other casualty except when same is attributable to its negligence; that while it does have an insurable interest in same as bailee when goods are in its possession and may at the same time insure same for full value for the benefit of owners, yet it has no right to insure same in transit to or from the warehouses; that since December 1, 1951 it has assumed a responsibility far in excess of that imposed by custom or law by issuing "insured warehouse receipts" to customers stating the cotton is fully insured against all casualty except war, both while the goods are in storage and in transit; that having assumed this excessive liability, it has for the apparent purpose of protecting itself and its customers procured a policy of insurance payable to itself with the American Fidelity Fire Insurance Company of Richmond, Virginia covering every casualty except war; that the assets of this insurance company are grossly inadequate to protect against loss by flood damage because defendant handles three million bales of cotton per season, stored in various quantities in its 98 or more warehouses throughout the Mississippi River Valley, where the damage of flood is so great that qualified American Companies will not write flood insurance on same; that a concentration of ten thousand bales, if lost, would exceed the total assets of said insurance company, or a loss of one hundred thousand bales would exceed the total assets of both the insurance company and of defendant; that said policy contains a 30 day cancellation clause; that, although purporting to have reinsurance in Lloyd's of London, the same has

not been legally effectuated, but even if it be so effectuated neither the defendant nor the owners of the cotton have any right of action against Lloyd's; that in event of insolvency of the primary insuror, the only recourse would be to share pro rata with all its other creditors; that defendant by its conduct of representing the receipts to be fully insured and by paying losses to customers and thereafter collecting from the insurer, it has made itself virtually the primary insuror with unlimited exposure and with recourse only against its primary insuror; that the liability of the numerous subscribers or syndicates who are individuals composing a Lloyd's coverage, each taking a small part of the risk, is several and not joint; that the acts of defendant through its officers are ultra vires and illegal; that the only conceivable reason for such an insurance program is all of this insurance is written through Whitfield King & Company, which is owned by said defendant W. L. Taylor and his kinsman John S. King, Jr., yielding them a yearly commission of more than one hundred thousand dollars; that prior to this extended insurance program all insurance has been written by the said agency resulting in large benefits to said W. L. Taylor and his family and other relations; that because of said control of the defendant by W. L. Taylor, demand upon said officers and directors would be futile, and same has not been made, that suit is filed to correct said above acts, and because the danger of flood damage is so imminent and the risk of loss to defendant is so great, time does not permit such demand upon them.

An injunction is sought against further representation in said warehouse receipts or otherwise of full insurance coverage on cotton in situ and in transitu, against further payment of premiums, and requiring notice to customers that said insurance is no longer in effect.

A decree is sought requiring said Taylor and King to restore to defendant all commissions received by reason of said insurance program; also for costs and attorney's fee against defendants.

The Chancellor declined to issue a temporary injunction.

After defendant's demurrers were overruled, full answers were filed by them, the substance of which is it is denied that W. L. Taylor dominates and controls the corporation as alleged; denied that it is not required to carry any kind of insurance and avers it is required by the Federal Warehousemen's Act, 7 U. S. C. A. Sec. 241 et seq., and the Department of Agriculture to carry insurance on stored cotton when so requested in writing by the owner of the cotton or the holder of the receipt; it avers that competing warehouse companies carry insurance, so that without it defendant would be at a disadvantage; it is denied the defendant would be liable for loss of goods in storage only in event of its negligence and denies it has no right to carry insurance for itself and customer except when it has possession of the goods as bailee; it is denied it has assumed liability in excess of that ordinarily assumed by a warehouseman or that imposed by law.

It admits that since December 1, 1951 it has carried the insurance and represented the same as full coverage on cotton in situ and in transitu for which it has as a part of its tariff collected from customers an additional charge of one cent per $100 of market value per month and avers that defendant would only be liable for failure to carry the insurance as represented to customers.

The allegations of the bill as to the imminence of catastrophic loss from flood are denied, but the desirability of flood insurance coverage, which it obtained by the said policy, is averred.

With reference to the reinsurance of said policy by Lloyd's it relied upon the usual "cover note" of the broker, until the risk could be subscribed by the syndicates, and avers that it is protected both by the "cover note" and by a Lloyd's policy, both of which contain an insolvency clause with reference to the primary insuror, but the interpretation of this clause in the bill is denied as to its correctness.

It is admitted that the insurance has continuously over the years been written through the agency of Whitfield King & Company including the present policy, but W. L. Taylor denies that he owns any interest in said agency or that the premium received by it will benefit him or any of his family or relatives.

The allegations of the bill as to the reasons for failure to demand relief through the corporation before bringing this suit are denied.

■ Appellants' first assignment of error does not conform to Rule 11(2) of this Court in that it states broadly and generally the Chancellor erred in not granting the injunction for the reasons stated in the bill, the admissions in the answer and the evidence set forth in the brief. It fails to state specifically wherein the action of the Court is erroneous and how it prejudiced the rights of the appellants.

We have had to look to the argument and to the statement of "the question" in the original brief; to learn what specific matters of law and fact we are to rule on. This practice seems to be growing among the members of the Bar, but we disapprove it.

The theory and insistences of appellant, with one exception to be found in the "rebuttal brief" are thus stated:

"1.  Are complainants, minority stockholders, entitled to enjoin the Officers and Directors from causing the Company to incur risks and liabilities and expose the Company to losses, millions of dollars in excess of its total resources, by launching on an insurance program—

(a)  Which no law requires the Company to undertake;

(b)  Without which the Company has successfully operated for years;

(c)  Which imposes liability upon the Company to the owners of cotton for the full amount of all losses in excess of insurance carried in good and solvent companies;

(d)  Which embraces a flood risk greater than any American Company will insure or reinsure;

(e)  Which can only be reinsured by more than one hundred foreign underwriters whose addresses and financial responsibilities are unknown, and each of whose undertaking is several, and not joint or joint and several, with a maximum undertaking on the part of any underwriter of 0.40540 of the entire reinsured risk; and no one of whom is subject to suit in Tennessee or any other State in which the Company operates;

(f)  Which permits unconditional cancellation of direct and reinsurance on thirty days' written notice;

(g)  Pursuant to which W. L. Taylor has caused the Company to channel millions of dollars in premiums through an agency owned by him and his kinsman, with hundreds of thousands of dollars in commissions retained by the Agency;

(h)  Where the risk of loss was too great and too imminent to await any action the Officers and Directors might take if demand were made, and where such demand would in any event have been an idle formality or futile.

2.  Should W. L. Taylor and Whitfield King & Co. be required to pay to the Compress Company all of the

monies which Whitfield King & Co. has received by way of commissions resulting from the insurance program."

As the foregoing covers practically the whole case, we here make findings of facts as follows:

This compress company has been in operation for many years and has grown to the extent that it has warehouses located throughout the cotton section of the Mississippi River Valley, some of small capacity others larger up to the capacity of the plant in Memphis of 300,000 bales; it is one of the largest cotton and cotton linters warehousemen and handles about 75% of the crop in this area.

Its customers consist of the producers from whom the cotton originally comes after being ginned and of cotton merchants or factors who buy and sell in the usual course of business after it has reached the warehouses.

■ For many years it has carried insurance against fire and lightning for the benefit of its customers under what are known as bailee policies. These are floating policies which cover any goods while in possession of the warehouse without particular description of same in the policy, as in the course of trade same may change in ownership and may or may not move out to the mills and other cotton come in.

Vide, Smith v. Carmack, Tenn. Ch. App., 64 S. W. 372, 377.

However, it had never carried bailee flood insurance until the present coverage was effected in December, 1951. The same has been sought for several years for the benefit of the small farmers and ginners, as a more complete protection for them, because they have not been able to procure it for themselves largely because the cost of handling the individual policies made it unprofitable to the insurance companies; the compress company however was unable to procure it for them, probably because of the fact

that the cotton merchants and other larger operators have been able all along to obtain flood coverage along with fire etc. under transit policies and these companies collected an additional premium or charge each time the warehouse receipt was negotiated. The present plan which the bill attacks is costing these other insurance companies a large loss of premiums by eliminating this transfer charge.

Eventually the agency for the Compress worked out the present plan, working with Lloyd's of London, who are not qualified and cannot qualify to operate in Tennessee and the other States wherein the Compress operates, with the Virginia Company above named, who are qualified in Tennessee, and with the Federal Warehouse Administrator.

Under it not only flood but every other casualty except war is covered 100% plus coverage of the cotton in transit to or from the warehouse, for the additional charge of one cent per $100 market value per month to the customers of the Compress. This is added to the tariff paid by the customer for the warehouseman's service and this present tariff has been approved by the Federal Administrator.

■ We further find that of a half million shares of issued and outstanding stock held by 3394 separate stockholders, W. L. Taylor and his family own less than 5%, and that there is no evidence that he dominates and controls the corporation. Further that he does not now own nor ever has owned any interest in, or received any direct or indirect financial benefit from, Whitfield King & Company. Further, this insurance agency both before and since its change to corporate form has for many years handled practically all of the Compress' insurance, has collected the same premium as would have been collected

by any other agency, and that insurance written directly with an insuror would carry the same premium as if written through an agency.

Not only is the flood coverage desirable, but the transit feature protects both the customer and the warehouse; experience has shown that frequently when claims are made for damage or loss, it is difficult to determine whether the same occurred in transit, for which the warehouse would not be liable, or while in storage, for which it would be liable; this coverage protects it against doubtful claims of this sort because the matter is left with the insurance carriers to handle.

In support of this general assignment of error it is insisted in the argument:

(1) That the entire insurance plan is ultra vires, because the defendant is doing everything an insurance company would do except no formal policy is issued by it; that defendant has no legal right to write insurance in the sense of becoming an insuror.

This is answered by code Section 3831:

"May make insurance.—The corporation shall have the right to insure cotton or other products or merchandise stored with it, but the right to issue policies or effect insurance shall not extend beyond doing business with their customers, and all general insurance business is prohibited."

(2) That, while a warehouseman may insure goods in actual storage for himself and for the owner for full value, because he has an insurable interest, yet he cannot insure goods in transit and not in his possession, for lack of insurable interest; that therefore the transit insurance feature of the policy is void, as a result of which the defendant has assumed a tremendous liability by the issuance of the warehouse receipts and by its advertise-

ments representing that this risk is fully insured, because of the large volume of cotton in transit during the peak of the season.

We think there is no merit to this insistence.

■ While it is true that a warehouseman is under no legal obligation in this State to carry insurance for customers, except under the Federal Act and Regulations if it be requested in writing by a depositor in a federally licensed warehouse, then a bona fide effort must be made to obtain it; it is settled, however, that he may carry it if he chooses, and if by custom, representation or express contract, any of which will bind him to do so, he fails therein, he becomes liable not as an insuror but for breach of contract to the extent of his failure to insure for full value in solvent companies. Lancaster Mills v. Merchants' Cotton-Press & Storage Co., 89 Tenn. 1, 14 S. W. 317.

■ We think the defendant does have an insurable interest in the cotton in transit. The testimony of Mr. Blackburn, a competitor of defendant, is a clear demonstration that it does have, on account of the frequent uncertainty as to whether the damage occurred in transit or in storage.

In Baird v. Fidelity-Phenix Fire Ins. Co., 178 Tenn. 653, 667, 162 S. W. (2d) 384, 390, 140 A. L. R. 1226 the Court quotes 29 Am. Jur. p. 293: "anyone has an insurable interest in property who derives a benefit from its existence or would suffer loss from its destruction", and adds: "it is sufficient that a loss of the property insured not only would, but might subject the insured to pecuniary injury."

(3) That the whole insurance plan is fatally defective and affords no protection against liability for enormous flood damage, which defendant has purported to insure against, because (a) Lloyd's policy is not signed by the

individuals supposed to be on the risk, (b) the reinsurance gives no right of action to either the owner of the goods or to the defendant compress, but is a contract solely with the primary insuror, (c) the loss assumption clause and the insolvency clause would require the Federal Compress, in event of insolvency of the primary insuror, to file its claim or claims with the receiver and await the liquidation of the assets of the primary insuror before the net amount due could be determined, and that Federal Compress would only share pro rata as a common creditor in the assets of the primary insuror, thus leaving Federal open to claim by the owners of the cotton for the deficits;

■ (4) ·That the underwriters are British subjects and mostly non-residents of our Country would make it too difficult, if not impossible, to sue and collect, if necessary to enforce liability. We find no merit in any of these insistences. The policy is executed in the usual manner of all Lloyd's policies, covering in this Country billions of dollars of insurance and reinsurance. The evidence shows that the two large groups of American companies which engage in this field of cotton insurance are reinsured in Lloyd's, as well as the fact that Lloyd's coverage is considered the best in the world; that Lloyd's has been in business since the year before the Revolution of 1688 and has never failed to pay a legitimate claim. While an ordinary reinsurance contract is one of indemnity between the primary insuror and the reinsurer, in which the latter is not in privity with the primary insured, yet by apt words the reinsurance may be or become an assumption of liability by the reinsurer to the primary insured. Royal Ins. Co. v. Vanderbilt Ins. Co., 102 Tenn. 264, 52 S. W. 168; Ruohs v. Traders' Fire Ins. Co., 111 Tenn. 405, 78 S. W. 85.

■ That has been done in this case to the extent that, in case of insolvency of the primary insuror, Lloyd's will pay directly to Federal Compress. This is nominated the "Loss Assumption Clause". This clause provides the Compress shall not be entitled to receive in the aggregate more than the *net amount* remaining due to it from the primary insuror and that the liability shall be reduced by any payments made to the primary insuror.

Whatever uncertainty might have arisen from this expression "net amount" is removed by the subsequent "Insolvency Clause", which provides that the contract "shall be so construed that the reinsurance shall be payable by (Lloyd's) on the basis of the liability of (American) under the contract or contracts reinsured without diminution because of the insolvency of the assured".

■ The fourth proposition is answered by the "Service of Process Clause", which provides that upon failure of Lloyd's to pay a claim, Lloyd's will, at the request of the "Assured", submit to the jurisdiction of any competent court in the United States; service of process and acceptance of service on or by a designated agent and entry of general appearance are provided for.

Necessarily in the event of insolvency of the primary insuror (Lloyd's "Assured"), the Federal Compress becomes entitled to be paid directly for claims, by the express provisions of the clauses supra, and hence entitled to the right to sue which rests only in the American so long as it remains solvent.

The Chancellor did not deem it necessary to make any finding as to the degree of imminence of flood damage nor do we; we think the insurance plan and coverage is sound and adequate to protect against loss from any floods within reasonable human contemplation and experience.

We failed to mention that after Federal obtained this coverage its example was followed by its competitors.

■ One other criticism of the Lloyd's coverage is the 30 day cancellation clause. The evidence is there is nothing unusual in this; in fact some policies have a 5 day clause.

The first assignment is overruled.

■ Assignments 3, 4, and 7 object to the admission in evidence of the Lloyd's policy and endorsements above referred to upon the alleged ground they were unsigned and unexecuted.

As above stated, however, it appears from the testimony of witnesses called by appellants and by the Lloyd's broker who obtained the policy that it was executed in the customary way in all respects.

These assignments are overruled.

The second assignment complains of the failure of the Chancellor to render a judgment against W. L. Taylor and John S. King, Jr. for the amount of the insurance premiums paid by the Compress to Whitfield King & Co., because of (1) Taylor's alleged financial interest in the agency and (2) the alleged waste and mismanagement in the institution of this insurance plan.

As to the first reason, appellants called these adversary parties for the purpose of proving Taylor's ownership of stock in the agency. They testified negatively but by these same witnesses appellants introduced the corporate records of this agency which purport to show the fact to be otherwise, that is, Taylor does own an interest. Counsel for appellants insisted at the hearing these records are competent evidence to prove Taylor's financial interest.

The Chancellor ruled that this would amount to allowing appellants to impeach their own witnesses, which may not be done. The result of this ruling was to leave the

testimony of the witness uncontradicted and unimpeached by either direct or circumstantial evidence, so that under the rule stated in many of our cases, some of which are cited in Bank of Hendersonville v. Dozier, 24 Tenn. App. 178, 191, 192, 142 S. W. (2d) 191, their testimony would have to be taken as true.

The question now appears in the briefs, and, although not determinative for reasons to be stated and not specifically assigned as error, it has evolved into an important question as to the rules of evidence, which does not seem to have been ruled on specifically by our appellate courts, although there are many decisions from other jurisdictions. Hence, we think it worth a limited discussion.

Counsel for appellees, page 66 of the brief, states his position thus:

"It is true, as insisted by appellants that where one calls a witness, particularly hostile in interest, one is not bound by the testimony of such witness if conflicting proof has been adduced from *other witnesses,* but under *no circumstances* may the credibility of such witnesses be impeached".

There are two defects in this statement, which are indicated by the italicized words. The conflicting proof is not confined to testimony of other witnesses but may be shown by any competent evidence appearing from the testimony of the same witness, whether it be testimonial or documentary, direct or circumstantial, provided always the real objective is not solely to discredit the witness, but to prove the facts relevant to the controversy; and this should be permitted whatever the incidental result may be upon the credit of the witness.

"The general rule that one cannot impeach his own witness must not be understood to imply that the party is bound to accept such testimony as correct. On

the contrary, it is very clear that the one producing a witness may prove the truth of material facts by any other competent evidence, even though the effect of such testimony is to directly contradict his own witness''. Jones ''Evidence'' (3d Ed.) Sec. 857, esp. note 94. 58 Am. Jur. 443, Sec. 798, last par.

''A party is not bound by all the statements of a witness called by him, if adverse, even though no other witnesses are called to contradict him; the party may rely on part of such testimony, although in other parts the witness denies the facts sought to be proved''. Jones ''Evidence'', Sec. 857 note 98 citing Mitchell v. Sawyer, 115 Ill. 650, 5 N. E. 109, 112, where the court said:

''It is much pressed before us that, as the evidence upon which complainant's case depends, comes from the defendants themselves, who were witnesses introduced by complainants, that the latter are bound by the testimony of their own witnesses, by what they said in favor of the conveyances, as being for good consideration and in good faith; that they may not accept a part and reject the rest of their testimony. A party may not discredit his own witness by direct impeaching testimony, but we are aware of no rule whereby one is bound by any testimony his own witness may give. * * * It is the facts and circumstances here in evidence which make the complainant's case, and they are entitled to the full force of the evidence arising therefrom by whosesoever witnesses the same may be shown.''

Substantially the same situation arose in Wallach v. Wylie, 28 Kan. 138, cited in 21 L. R. A. 425, wherein Wylie introduced the deposition of his adversary, Wallach because he was the only person by whom Wylie could prove certain facts.

The court said:

"He still had the right to introduce other testimony, the testimony of Wallach himself, and of other witnesses, if they could be found, to prove that the facts of the case were not such as Wallach stated them to be in his general statements".

This is not in conflict with Bank of Hendersonville v. Dozier, supra, because there the attack was solely upon the credibility of the witness in part presumably because of the interest of the witness as an adversary party, see page 192 of 24 Tenn. App., page 200 of 142 S. W. (2d), but is actually in accord with the full statement of the rule therein.

In the instant case the fact in issue was Taylor's alleged interest in the insurance agency. Its records were introduced through him and King to prove that fact, which they testified was not the fact. We think it competent and entitled appellants to argue that the records established the fact, although this contradicted the witnesses and could have had the incidental effect of impeaching them, although not introduced for that primary purpose and not available for argument to establish impeachment.

Coming to a consideration of the evidence, while the corporate records prima facie show Taylor as a stockholder in the agency, we think this is fully explained by the testimony of Taylor and King to the effect that Taylor simply loaned the use of his name when the agency was converted into a corporation, the necessity for which arose out of a very unfortunate situation in which the widow of the deceased former owner got herself physically and mentally, the details of which need not be recited.

Suffice it to say Taylor was interested in her welfare because of intimate family friendship and distant kinship

and in the fact that her conduct in squandering money was jeopardizing the large volume of premiums being paid into the agency for remittance to the insuror. The records do show a large block of stock was issued to Taylor, but the certificate was immediately endorsed to King who had acquired ownership of all the stock of the agency. No question of estoppel is involved.

As to waste and mismanagement by Taylor of the Compress's assets, it is clear from all of the foregoing that none has been shown and the insurance plan is good.

This assignment is overruled.

The fifth assignment complains of the exclusion of an insurance company's report of a large fire loss in the Compress at Blytheville, Arkansas, in 1940. This report was hearsay and not material to any charge made in the bill and was properly excluded.

Overruled.

The sixth assignment complains of the exclusion of evidence that W. L. Taylor owns a corporation, Federal Securities Company, which among other things trades in the Compress Company common stock and that Taylor declined an offer to let this stock be listed on the New York Curb.

This evidence, whatever it might have been, was not relevant to any charge of mismanagement in the bill and was properly excluded. Overruled.

In the "rebuttal brief" of appellants a question is raised for the first time.

The effort is now made to bring the Compress Company within the terms of Code Section 6135 and 6141, the first making it a misdemeanor for any person to solicit or effect an insurance contract, *other than for himself,* with any foreign insurance company not qualified in this State, and the second making such person personally liable on any

such contract made by or through him, directly or indirectly. It is sought to apply the case of Woolwine v. Mason, 128 Tenn. 35, 157 S. W. 682.

This theory that the Compress has made itself personally liable under this statute is predicated on the testimony of W. L. Taylor and others that the Compress first investigated the probability of getting the protection in Lloyd's and succeeded in getting a commitment from them that they were willing to go on the risk, although they were not qualified to take it directly, after which commitment the insurance was written by American which is qualified in this State.

We think an all sufficient answer, even if the statute were otherwise applicable, is that, as heretofore shown, the Compress had an insurable interest with respect to every phase of the policy coverage and could lawfully insure not only its limited interest but the full value of the cotton for the benefit of owners, and having made itself liable to the owners for full value by representations it was fully covered, the Compress had an insurable interest to the extent of full value. Hence, by the express words of the Statute the same has no application, because the arrangement with Lloyd's was made by the Compress for its own benefit, even if it at the same time benefited others.

Moreover, it is obvious from the record that the so-called commitment was nothing more than an assurance by Lloyd's that, if the Compress could obtain insurance in a company qualified in Tennessee, Lloyd's would be willing to reinsure that company's risk.

We find no merit in this insistence and same is overruled.

We have not dealt with the question whether demand on the officers and directors to bring this suit was a pre-

requisite to its maintenance. We do not purpose to decide the question, because it has become moot in view of the disposition of the case on its merits by the Chancellor and by this Court. The merits have been fully developed and decided adversely to complainants and there is nothing to be gained by extending this opinion by a discussion that would be only academic.

All assignments of error of appellants are overruled.

Coming to the cross-appeal of defendants, the one assignment of error is the refusal of the Chancellor to retax the costs so as to require complainants to pay as part of the costs reasonable counsel fees incurred by defendants.

It is said the Chancellor was of opinion that, in the absence of statutory authority, counsel fees may not be taxed as costs.

Counsel for cross-appellants in an able and instructive brief has shown that the High Court of Chancery in England has always had the inherent discretion and right independent of statute to tax not only the ordinary cost designated as "party to party" costs but also in a proper case extraordinary costs designated as "costs between solicitor and client" which includes counsel fees. Daniels Chancery Pleading and Practice (5th Amer. Ed.) 1377-1434.

Also, that the Chancery Courts of the State and of the Federal System have the same powers except as modified by statute, Gibson's Suits in Chancery, sections 16-20, Sprague v. Ticonic Nat. Bank, 307 U. S. 161, 59 S. Ct. 777, 83 L. Ed. 1184, and that solicitor's fees have been allowed by the Chancery Courts of Tennessee as part of the costs in a proper case and the authority so to do has not been limited by statute. Smith v. Haire, 138 Tenn. 255, 197 S. W. 678; Whitsett v. City Bldg. & Loan Ass'n,

3 Tenn. Ch. App. 526; Carter v. Virginia Surety Co., 187 Tenn. 595, 216 S. W. (2d) 324.

The case of Guardian Trust Co. v. Kansas City Southern Ry. Co., 8 Cir., 28 F. (2d) 233 is a very instructive case in that the opinion sets out the different types of cases in which counsel fees have been taxed as costs both in the English and American cases; particularly applicable here are those where there was no fund in court and the fees were taxed against the losing party.

Many cases will be found in Tennessee where counsel fees have been allowed and paid out of a fund or property in custodia legis for services in creating or preserving such property, but none where, absent such property, the losing party has been adjudged liable for counsel fees of the successful party.

To the contrary, the Supreme Court has clearly and positively refused to adjudge such fees against the losing party, on the ground of public policy, despite any inherent right in equity to do so. Stringfield v. Hirsch, 94 Tenn. 425, 29 S. W. 609; Williams v. Burg. 77 Tenn. 455.

The former was an effort to obtain counsel fees as an element of damages on the bond where the attachment was wrongful.

In the latter counsel fees were sought as an element of damages for breach of a contract of warranty of title.

In those opinions it is recognized that in some States and in the Federal Courts a tax fee is in some instances allowed, but it is said such fees have never been allowed in Tennessee. We think it matters not what the type of case may be, whether ex delicto, ex contractu, or upon injunctions or attachments, actions at law or suits in equity, howsoever vexatious or oppressive, these cases declare our public policy to be opposed to the allow-

ance of counsel fees of the successful party against the defeated party, when there is no property in court.

The opposite view prevails in the English administration of law today whereby the losing party must pay all expenses of the successful party including counsel fees; this is regarded as one of the greatest defects in that system and seems to be under critical study with a view to revising the entire system of costs. A. B. A. Journal, April, 1953, page 279, note 3.

The assignment is overruled.

A decree will be entered here dismissing the bill with costs below and on appeal against complainants.

Felts and Avery, JJ., concur.