**STATE of Tennessee, Appellant,**

v.

**Gene SILVA, Appellee.**

Supreme Court of Tennessee.

March 6, 1972.

David M. Pack, Atty. Gen., C. Hayes Cooney, Asst. Atty. Gen. State of Tennessee, J. Alonzo Bates, Dist. Atty. Gen., Centerville, for appellant.

J. W. Rutherford, Nashville, for appellee.

OPINION

ERBY L. JENKINS, Special Judge.

The defendant below, Gene Silva, was convicted in the Criminal Court of Williamson County in a non-jury trial of violating T.C.A. § 37–270, by contributing to the delinquency of a minor and was sen-

tenced to six months in the county jail or workhouse and was fined $50.00.

The indictment under which he was convicted charged that the defendant, Gene Silva, on the 8th day of January, 1970, unlawfully did contribute to or encourage the delinquency of a certain child, to-wit: one Diane Fowler, then and there under the age of eighteen years, by aiding or abetting or encouraging the said child in the commission of an act of delinquency, to-wit: "The said Gene Silva attempted to persuade the said Diane Fowler to check into a motel room with him, they not being married."

Section 37–270 of Tennessee Code Annotated provided in part as follows:

"Any adult who shall contribute to or encourage the delinquency of a child whether by aiding or abetting or encouraging the said child in the commission of an act of delinquency or by participating as a principal with the child in an act of delinquency or by aiding the child in concealing an act of delinquency following its commission shall be guilty of a misdemeanor . . . "

The defendant made a motion for a new trial which was overruled, and appealed to the Court of Criminal Appeals, which court in a split decision reversed the judgment of the Criminal Court of Williamson County and dismissed the case, and this Court has granted certiorari.

The defendant below, a twenty-nine year old married man in the bloom of youth, with two children, prior to and at the time of the inception of his troubles, was the solicitor for a so-called charitable organization known as Mission Workers Organization.

In the conduct of his business, he employed one Diane Fowler, fifteen years of age, who according to the record, shook or rattled a tambourine around the streets and in front of business houses mostly during the long holidays before Christmas when the average person is in a giving mood.

On the day and date in question, the defendant picked up Diane, she being out of school on account of snow, and drove to a combination motel-restaurant near Franklin, parked in front of said place, and was seen by a witness who said "they were hugging and kissing, and that sort of thing." The defendant had earlier overpaid Diane to the extent of about ten dollars, it appearing in the record that Diane was to receive one-third of what she collected, and we think it can be more or less assumed that the defendant, Gene Silva, in the operation of this so-called charitable business and in the red-tape of the administration thereof took his fair share of the offerings, and thus, charity in this instance began at home. Anyway, it is apparent from the record that the solicitors were to benefit more financially and otherwise than the needy children that they were allegedly collecting for.

Be that as it may, on said date, the defendant, after picking up Miss Fowler, attended to some business in Nashville and drove to the Roberson Motel in Williamson County, and parked in front of its restaurant, it being a combination motel and restaurant, and after "hugging and kissing" for some thirty minutes, borrowed ten dollars from her and entered the motel, rented a room and purchased two cokes to go.

As heretofore stated, while the two of them were parked in front of the motel, they were observed by the principal of the Franklin Junior High School, who was apparently out of school also on account of snow. It could be said that he was of a suspicious nature, but nevertheless this conduct aroused his suspicion, as it should, and he called the sheriff whose deputy and a highway patrolman arrived and asked Miss Fowler if anything was wrong, and she replied that there was not. During this time, Gene Silva, who was on the inside in the act of renting a room, saw the officers, and according to witnesses, became nervous, left his change, went to his automobile and drove off, and was apprehended by the officers some ways off who

arrested him and placed him in jail. He called his wife from jail and she, at that time, took a dim view of the situation.

On the trial of the case, the State, of necessity, used Diane Fowler as a State's witness and she was, to say the least, not sympathetic with the State's case, and we have some misgivings about her conduct in front of the motel as well as her testimony. She testified that she told the defendant three times that "she wasn't going in there," and " . . . you know, I didn't know what to say or do, I just sat there." She testified that the defendant made her no proposition, but the trial judge was justified in taking her testimony with a grain of salt. As a matter of fact, the learned trial judge disbelieved both Gene Silva and Miss Fowler, and for good cause.

 Of course, it is fundamental that when the State calls a party as a witness it vouches for his or her credibility but it is also fundamental that while the State cannot directly impeach its own witness unless caught by surprise or the witness is shown to be a hostile witness, it is not bound by said witness' testimony but can offer other testimony on facts and circumstances that are in conflict with the testimony of the witness and then it is for the Court and jury to sift the evidence and weigh it and decide who is telling the truth.

In Hewgley v. General Motors Acceptance Corporation, 39 Tenn.App. 553, 286 S.W.2d 355, it is stated:

"1. It is true there is a rule that a party cannot impeach his own witness, and this precludes him from impeaching the witness in certain ways, such as by proof of bad character, etc., but it does not mean that he is bound to take the witness' testimony as true where it is in conflict with other evidence, testimonial or circumstantial, or otherwise appears to be untrue. Gillespie v. Federal Compress & Warehouse Company, 37 Tenn. App. 476, 494, 265 S.W.2d 21, 30; 3 Wigmore on Evidence (3rd ed.) secs. 896–916."

In King v. State, 187 Tenn. 431, 215 S. W.2d 813, this Court stated:

" 'The general rule obtains in criminal as well as civil cases, that a party cannot impeach his own witness, but this is subject to the exception that where a party is compelled to call an indispensable witness, or a witness that is hostile taking the party by surprise, such witness may be impeached by the party calling him. This exception is equally applicable to the prosecution, because the state must bring forward all witnesses obtainable, and it would be unfair to the prosecution where it could not contradict an unexpectedly hostile witness. In such case the hostility may be shown by the witness himself or otherwise, and he then may be examined as to his contradictory statements; but the impeachment of one's own witness is limited to those cases where his testimony is in direct contradiction to his prior statements, and he cannot be impeached where he is merely reluctant to give testimony or unless the testimony is actually prejudicial.' Wharton's Criminal Evidence, Vol. 1, 10th Ed., sec. 484a, p. 1002."

We approve the language contained in 58 Am.Jur. 797.

"*Contradictory Evidence.*—The rule that a party cannot directly impeach his own witness cannot be taken as meaning that a party is bound by what his witness says, even though he does not deny or contradict his witness' statements at the time. Although he may not impeach the general reputation of the witness for truth and veracity, he may, by other witnesses, prove that the facts are otherwise than as stated, and it is no objection to any relevant evidence of material facts on which he relies to sustain his case that it may operate to contradict, and thus discredit, his own witness. There is no rule which prevents a party from showing his witness to have been mistaken as to a particular fact by means of other witnesses. This is true not only where it appears that the witness was in-

nocently mistaken, but even where the evidence may collaterally have the effect of showing that he was generally unworthy of belief. This is one of the exceptions to the general rule that a party cannot impeach his own witness. Indeed, were a party forbidden to contradict his own witnesses, everyone would be at the mercy of his own witnesses, and if the first witness sworn should swear against him he would lose the testimony of all the rest, which would be a perversion of justice."

If the law were otherwise, the State would be in a precarious position in offering any witness because the State, in the prosecution of criminal cases, must offer such proof as it has and to say that the State is bound by the testimony of a witness without considering all the other facts and circumstances would be to impose an unfair and sometimes impossible burden on the State.

This defendant was not convicted on the testimony of Miss Fowler alone, but also on the testimony of the school principal, the testimony of officers and other witnesses, and also by surrounding facts and circumstances. Incidentally, in this time when people close their eyes to open crimes, we need more citizens of prying proclivities and urgent speech, and we commend the school principal for his conduct in this case.

When this defendant parked in front of the combination motel-restaurant and began hugging and kissing this fifteen year old girl in wide open daylight and where witnesses could observe him, he was sorely tempted and the passion that possessed him had conquered his reason and swayed his judgment, and in this blinded state he went to the motel clerk and rented a room, and bought two cokes. At that time, his mind and thoughts were far from his hearthstone, and his testimony that he was renting this room for himself and his wife, who was then many cold snowy miles away from him, is too thin to believe, for it is apparent from the record that the signs point toward his guilty intentions, and his conduct in front of the motel was not that of the true and faithful husband and father, for at the moment he had forgotten the wife of his bosom when temptation beset him. It is not clear whether Diane tempted him or he tempted her, or whether they just tempted each other.

Be that as it may, this ridiculous excuse of renting a room for himself and his wife is unbelievable. It must be remembered that at the time the defendant was renting the room, his wife was in Nashville at home with the children, unaware of his so-called plans to take her out for the night, and that to accomplish his stated purpose he would have had to drive home and tell his wife of his plans; she would have had to ready herself for the occasion, obtain a baby sitter, and they then would have driven back to the Roberson Motel, covering a total distance of more than thirty miles in rough winter weather, consuming at least three hours in time. Human experience teaches us that by this time his ardor would have subsided and his blood run cold.

However, he was apparently either a good father and husband, or a good salesman, for by trial time his wife had either forgiven him of his indiscretions or believed in his innocence for she gave aid and comfort to him in that she swore that at times they did go to a motel room to find surcease from the workaday world of taking care of two children. We must say this is not the usual way of married life as we have observed it, but she rose to his defense as good wives often do when "we are in trouble."

The Court does not condemn her for coming to the aid of her beleaguered husband, the defendant, but takes a rather clouded view of this angle of the defense because we think that it is rather unusual that a man would be "hugging and kissing" another woman, borrow money from her, and then enter a motel and rent a room for himself and his wife. When passion rules, concern for the woman at hand is the

usual pattern, and it is not suddenly and without temptation or provocation transferred from one to the other, especially when the other is many miles distant and it is cold and snowy outside. The learned trial judge had a right to disbelieve this testimony.

We, therefore, reverse the action of the Court of Criminal Appeals and sustain the judgment entered by the Criminal Court of Williamson County. However, since it appears that the defendant works regularly, and from the record, at trial time, had the confidence, love and affection of his wife, we would suggest to the Court below that it modify its judgment and put the defendant on probation so that he can continue to make a living for his family. We believe that the ends of justice will be met if the case is handled in this manner. We base this suggestion to the trial court under the authority of Stanley v. State, 171 Tenn. 406, 104 S.W.2d 819 (1937).

In making this suggestion, we believe the State has had its day in court. We know the defendant has had more time in court than he wants. To place him on probation would not be too merciful. He has suffered the humiliation of a trial for a would-be sin of the flesh, and had to seek refuge behind the petticoats of an angry wife who publicly forgave him, but whatever is done by the courts cannot restore the peace and harmony of that happy marriage, for if the pattern of wifely conduct runs true to form, he will throughout his natural life be reminded of the time she saved him from jail. When the members of this Court have passed to their respective rewards, whether upwards or downwards, the defendant will in all probability still be reminded of this unfortunate incident for it is a woman's right never to forget. She may think that she has forgiven him, and when she reminds him of his waywardness, she will not be fussing, only "telling him."

And if perchance the defendant should ever rise to high office, such as Justice of the Peace, a Deacon in the church, or a member of an appellate court, he will until death brings him blessed relief hear "if it hadn't been for me, you'd been a jail bird." Six months in jail would be a small price to pay for his sudden heat of passion, for he will all his married life remain suspect in her eyes, and as the shadows of life lengthen and his hair grows grey and he has more children and then grandchildren, he could hear the ever-present theme of "remember when I saved you from jail!" Jail in his declining years could be a sanctuary from an ever remembering and never forgiving wife. The prisoner of Chillon could become a kindred spirit.

A convict stays in jail for a stated time, is released, and aside from the stigma of prison, he is free, but a convict husband must forever bear the shackles of guilt, and no matter how hard he works, how much he accomplishes, how much he does for his partner in marriage, or how high he rises in the esteem of his fellows, he will remain a convict to her, and he will only escape temporarily each day while at work making a living.

This defendant has in the eyes of the law done wrong, but not enough in this instance to be jailed, and the least the trial judge can do is to relieve him of his temporary sentence, and remember that he is forever and eternally on probation to his wife, who will be his wife, his warden and parole officer all wrapped up in one. What a sad fate for any poor mortal to face. Whenever he is late from work and not home "on the dot," he can envision his wife wrinkling her brow in a gathering storm and nursing her wrath to keep it warm. This problem was recognized long ago, in Proverbs XX:19, where it is said, "it is better to dwell in a corner of the housetop than with a brawling woman in a wide house."

In his twilight years, after a life of toil, failure or success, when he is entitled to dream dreams and see visions, remember parts of a pleasant past and contemplate a place among the Blessed when he passes

from this green earth to a better land, and after he no longer remembers the name of Diane, much less her shape, form or figure, his musings will no doubt be interrupted by the shrill voice of his wife, warden and probation officer, "What are you thinking about—that woman the sheriff caught you with down in Franklin?"

We do not have the power to restore the defendant's matrimonial tranquility, would that we could; all we can do is make the suggestion of probation to the trial judge with the hope that he understands life and can foresee the bleak and lacerated future of the defendant.

The action of the Court of Criminal Appeals is reversed and the judgment of the trial court is sustained with the suggestion that a petition for probation be entertained as set out herein.

DYER, C. J., and CRESON, HUMPHREYS and McCANLESS, JJ., concur.