The FIFTH THIRD COMPANY,
Plaintiff-Appellee,

v.

MOORELAND ESTATES HOMEOWN-
ERS ASSOCIATION and Michael Tant,
Don McNeil, David Stocks and Anne
Vaughn, Individually and collectively as
the Board of Directors for the Moore-
land Estates Homeowners Association,
Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section at Nashville.

March 26, 1982.

Rehearing Denied April 16, 1982.

Application for Permission to Appeal
Denied by Supreme Court
Aug. 30, 1982.

Michael J. Philbin, L. Gino Marchetti,
Nashville, for plaintiff-appellee.

Denty Cheatham, Cheatham & Palermo,
Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

Plaintiff filed suit on April 18, 1980, in the Chancery Court for Williamson County against defendants the Mooreland Estates Homeowners Association (Association) and Michael Tant, Don McNeil, David Stocks, and Anne Vaughn, Individually and collectively as the Board of Directors for the Association. Plaintiff sought declaratory and injunctive relief in addition to monetary damages and attorneys fees allegedly incurred as a result of the denial of plaintiff's voting rights in the Association.

Defendants, together with other members of the Association, filed a counterclaim seeking to recover allegedly delinquent assessments from plaintiff and also sought damages for alleged defects in construction of individual residential units, the clubhouse, and other amenities, and the sewerage and drainage facilities.

The Chancellor bifurcated the issues and, on January 5, 1981, a bench trial was had on (1) plaintiff's contention that it had been wrongfully deprived of its voting rights in the Association and (2) the Association's counterclaim for alleged delinquent assessments.

The Chancellor (1) found that plaintiff was not delinquent in paying its assessments on March 17, 1980, when plaintiff's voting rights in the Association were revoked and ordered that plaintiff be restored to its voting rights in the Association, (2) ordered a retroactive 1980 assessment, established three classifications for assessment purposes and that the Association "file with the Clerk and Master a report showing the action taken by the Homeowners Association pursuant to" the Court's order, and (3) ordered the Association to pay attorneys fees for both plaintiff's and defendants' attorneys.

The Association reassessed the owners as per the classifications ordered by the Chancellor and, on May 1, 1980, the Chancellor approved the assessment. Pursuant to the Court's order, a special assessment of $238 was made to each of plaintiff's vacant lots and to each completed unit for the payment of attorneys fees of the parties; however, the payment of this assessment was stayed pending appeal.

The pertinent facts are as follows:

The original development plan involved a 26.08 acre tract set aside for 154 multi-family units with a common area, containing a clubhouse, swimming pool, and tennis courts.

Frank Webb Builders, Inc. began construction in 1973 with funds advanced by plaintiff's parent company, the Fifth Third Bank of Cincinnati, Ohio, through Thomas & Hill, Inc., a West Virginia mortgage lender which at the time had offices in Tennessee. By 1974 or early 1975, the clubhouse, swimming pool, and some of the private streets had been completed.

Frank Webb Builders, Inc. subsequently defaulted on the construction loan and, on March 4, 1975, Mooreland Estates was acquired through a foreclosure sale by Vander, Inc., a Tennessee corporation. On March 4, 1975, only one unit in the development had been sold. Vander, Inc. had been formed by Thomas & Hill, Inc. to hold title to distressed properties and for the purpose of attempting to get faltering projects back on their feet.

Vander, Inc.'s officers and agents voided the condominium documents prepared by Frank Webb Builders, Inc. in order to proceed with development and sale of residential units on the 26.08 acre tract as a planned unit development. In accordance with this plan, the Association was incorporated on January 22, 1976. On January 26, 1976, Vander, Inc. deeded the common area in the 26.08 acre tract to the Association.

The Association was chartered as a nonprofit Tennessee corporation "to provide for the maintenance, preservation, and architectural control of the building sites and common area."

The documents governing Mooreland Estates and its Homeowners Association consisted of a set of by-laws and a recorded "Declaration of Covenants, Conditions, and Restrictions." (Declaration).

Because of prevailing economic conditions, Thomas & Hill, Inc. and its subsidiary, Vander, Inc., were unable to stay in business and, on March 1, 1977, the mortgage and note made by Vander, Inc. to Thomas & Hill, Inc. were assigned to plaintiff.

Under the by-laws of the Association and the Declaration governing Mooreland Estates, the developer, who, at the time of adoption of these documents, was Vander, Inc. was known as the "Declarant."

Plaintiff subsequently became the "Declarant" by assignment on or about March 1, 1977, and at that time some of the units had been completed and sold and others were under construction.

The Declaration provides in Article III, Section 3, that the Declarant will be a "Class B" member of the Association and have three votes for each building site owned while all other members will be Class A, having only one vote for each building site. The voting rights of other members can only become equal to the Declarant when either (1) three-fourths of the building sites have been sold and the other members have as many votes as the Declarant or, (2) five years have elapsed since the first sale of a building site to another member (other than the only unit which was sold at the time of the Declaration). Five years have now elapsed and plaintiff, as Declarant, has only one vote for each lot that it owns.

Article IV, Section 1, of the Declaration provides that

[t]he Declarant, for each building site owned, hereby covenants, that each owner of any building site by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree, for each building site owned, to pay to the Association: (1) Annual assessments; (2) Special assessments, such assessments to be established, made, and collected as hereinafter provided."

Section 3 provides that "the Board of the Association shall set an annual assessment which shall be paid by all building site owners, including Declarant, for each building site owned by Declarant, said assessment taking into consideration current maintenance costs and future needs of the Association."

Section 6 provides that "Annual and Special Assessments must be fixed at a uniform rate for all building sites."

The organizational meeting of the Association was held on March 15, 1976. The Association's charter was accepted and the by-laws adopted. On the same day, the Directors of the Association adopted a monthly maintenance fee schedule which assessed a maintenance fee of $40 per month for four-bedroom units, $38 per month for three-bedroom units, and $36 per month for two-bedroom units.

Vander, Inc. paid all expenses of the Association while it was the Declarant. When plaintiff became the Declarant, it continued to pay all expenses of the Association into the fiscal year 1978. Funds collected from the individual unit owners under the original assessment schedule adopted on March 15, 1976, were deposited in the Association's bank account and were not used to pay the bills of the Association during 1976 and 1977. Plaintiff paid the expenses of the Association in lieu of paying assessments just as Vander, Inc. had done before. In 1978, however, most of the assessments which were paid by members other than Declarant, as well as most of the assessments paid by the members in 1976 and 1977 were co-mingled with plaintiff's contractor, CDC, Inc., which was managing the affairs of the Association without charge. These combined funds were used to pay current expenses of the Association. Plaintiff continued to pay a substantial portion of the expenses of the Association in 1978, contributing some $54,362.10 for this purpose. The Association, as a result of funds being used to pay expenses, had only $2,012.99 on hand at the end of 1978, according to the tax return.

At the March, 1979 annual meeting, the Board of Directors of the Association was increased from three to five members. The

new board members were resident building site owners, which gave them four members on the Board and the Declarant one member on the Board.

At the first meeting of the new Board, defendant Michael Tant, who had served on the three-member Board, was named President of the Association. At this Board meeting, an assessment was adopted whereby plaintiff would pay $26 per month to the Association on each of its remaining eighty-nine building sites and each individual unit owner was assessed at the rate of $80. Plaintiff paid $14 per month of each individual unit owners' assessment, making the amount paid by the individual unit owners $66 per month.

It is plaintiff's contention that the foregoing assessments were not arbitrary but rather were based on a good-faith effort to assess each class of property owners, that is, vacant lots and completed units in accordance with the benefits received. Plaintiff contends that the rate was based on a projected operating budget of the Association for the year commencing in May, 1979, and that a specific breakdown of the services and benefits to individual owners of completed units was as follows:

| | | |
|---|---|---|
| (a) | Water service | 11.30 |
| (b) | Sewer service | 7.57 |
| (c) | Garbage collection | 4.00 |
| (d) | Middle Tennessee Electric | 4.66 |
| (e) | Clubhouse maintenance, materials and supplies | 2.26 |
| (f) | Grounds maintenance | 5.53 |
| (g) | Pool maintenance and manager | .87 |
| (h) | Clubhouse cleanup | 1.40 |
| (i) | Master Antenna—Tenncom | 2.00 |
| (j) | Roofing escrow | 5.00 |
| (k) | Paint escrow | 10.00 |
| (l) | Insurance | 24.97 |
| | Sub-total | 79.56 |
| | Add real estate taxes | .80 |
| | Total | $ 80.36 |

It is plaintiff's insistence that it did not receive all of the foregoing benefits and services but that it was assessed and paid the same rate assessed to the individual owners for those benefits and services it received for its vacant lots and unfinished units. It contends that it was improperly assessed since it did not receive water service, sewer service, or garbage collection for its vacant lots. It did not receive any benefits from the master antenna or from insurance on completed and sold units. It contends that the assessment for the services and benefits which it did receive was as follows:

| | | |
|---|---|---|
| (e) | Clubhouse maintenance and materials and supplies | 2.26 |
| (f) | Ground maintenance | 5.53 |
| (g) | Pool maintenance and manager | .87 |
| (h) | Clubhouse—cleanup | 1.40 |
| (j) | Roofing escrow | 5.00 |
| (k) | Paint escrow | 10.00 |
| (l) | Insurance (for clubhouse only) | .94 |
| | Total | 26.00 |

Plaintiff continued to pay the expenses of the Association during 1979 which were in excess of the assessments collected.

The Board, on January 30, 1980, hired a professional property manager, Greater Property Management, Inc., headed by Mr. Douglas Dabbs. Mr. Dabbs, upon examination of the Declaration governing the Association, its property and members, came to the conclusion that assessments must be made at a "uniform rate" for all building sites. Based upon a "uniform rate" for all sites, a budget was prepared to be presented at the annual meeting on March 17, 1980, in which all 149 building sites would be assessed at $65 per month.

Plaintiff and certain members of the Board of the Association disagreed on the amount of assessment to be paid by plaintiff on its undeveloped lots. It was, and is, the defendants' contention that a "uniform rate" of assessment as provided for in the Declaration required plaintiff to pay assessments in an equal amount as those paid by the individual unit owners.

On March 12, 1980, five days prior to the annual Association meeting, four of the five members of the Board of Directors held a meeting by telephone. No written notice of a special Board meeting was sent to all Directors as required by Article VI, Section 2, of the by-laws. The Board member representing the Declarant was not notified of the meeting. Pursuant to the telephone meeting of the four Board members, a let-

ter was sent to plaintiff on March 13, 1980, declaring plaintiff delinquent in paying of assessments. This letter was received by plaintiff on March 18, 1980, one day after the Association meeting at which plaintiff's voting rights were denied.

At no prior time had anyone connected with the Association informed plaintiff that it was delinquent in its assessment payments.

We are first presented with determining what the meaning of "a uniform rate" is as provided in Section 6 of the Declaration which provides that "Annual and Special Assessments must be fixed at a uniform rate for all building sites."

It is defendants' contention that all building sites, whether vacant or whether they contain completed residences, must be assessed at an equal amount or, at the least, classifications should only be used "which are clearly contemplated by the language of the Declaration taken as a whole, or at least not clearly not contemplated by it."

Defendants concede that assessments do not have to be equal in order to be uniform, such as the first assessment made by the Board of the Association in 1976 which called for different assessments for two, three and four-bedroom units. However, plaintiff takes issue with the classification adopted by the Chancellor, which is as follows:

Classification A will include building sites which are unimproved or upon which partial structures exist but the roofing is not completed. The assessment shall include a full prorata charge for operation and maintenance of the clubhouse, swimming pool, tennis courts, streets and common area and for appropriate reserves for depreciation of the clubhouse, swimming pool, tennis courts and streets. The assessment shall include a proper charge for the cost of public liability insurance and for the cost of fire and extended coverage insurance attributable to the improvements located on the common area. The assessment shall also contain a full prorata charge for the Association's expenses for management

services, accounting services and legal services.

Classification B will include units under roof which have never been occupied. In addition to the charges included in Class A assessments, a charge of $7.00 per month for roof replacement escrow will be included.

Classification C will include occupied units (including all units once occupied without regard to subsequent vacancy or abandonment.) In addition to charges included in Class B assessments, a charge of $10.00 per month will be included for exterior repainting escrow and the assessment will include a prorata charge for such services as may be made available for Class C sites by the Homeowners' Association including but not limited to water, sewer, garbage collection, electricity, termite control, pest control, fire protection, police protection and insurance.

We have been unable to find any cases which have determined what is meant by "uniform rate" as used in Section 6 of the Declaration. However, we have been cited to several cases which we fell are analogous.

In *Matson Navigation Co. v. State Board of Equalization,* 297 U.S. 441, 56 S.Ct. 553, 80 L.Ed. 791 (1936), the Supreme Court was faced with the question of whether a California franchise tax denied a corporation equal protection since there were two different rates charged: (1) for a corporation engaged in intrastate commerce and (2) for a corporation engaged exclusively in interstate commerce. The Court upheld the taxing act, stating:

The measure of the exaction does not lack uniformity because of differences in the amounts of net incomes contributable to California. Appellants' contention is not supported by the fact that there are or may be substantial differences between amounts and sources of net incomes of corporations subject to the tax. The rate is uniform; no discrimination results from its application.

*Id.* at 446, 56 S.Ct. at 555. *See also Meicler v. Aetna Casualty and Surety Co.,* 506 F.2d 732 (5th Cir. 1975).

■ In order for the assessment to be uniform, it is not necessary that it be absolutely equal. If each of the owners similarly situated are assessed a rate based on a reasonable classification adopted by the Board, then the rate of assessment meets the requirements of Section 6 of the Declaration.

■ We are of the opinion that the classification set out by the Chancellor in his Memorandum is a fair and reasonable classification and meets the requirements of being uniform. Each owner, including Declarant, is assessed and pays a rate based upon the benefits and services received.

We are further of the opinion that the Board of the Association is free to adopt different classifications in the future on which annual and special assessments may be based so long as the classification adopted meets the test of reasonableness.

■ We are also of the opinion that the record supports the findings of the Chancellor "that, based upon the number of sites it owned, the Declarant paid more than its prorata share for operation and maintenance of the clubhouse, swimming pool, tennis courts and common ground" for the years 1977 through 1980.

While defendants take issue, we are of the opinion that the record supports the finding that for the period of March through December, 1977, the expenses of the Association, including escrow, were $38,259. The contribution from individual owners of completed units under the original assessment rate ($36 for two bedroom, $38 for three bedroom, and $40 for four-bedroom units) was $30,844. The expenses of the Association after the rate of assessment set out above was $27,375. Plaintiff paid the remaining expenses of $27,375 and, additionally, made an old payment of $9,807.04.

The actual expenses for 1978, including escrow, were $81,917.13. The owners of completed units, who continued to pay under the 1976 assessment rate ($36, $38, and $40 for two, three and four-bedroom units, respectively), paid a total assessment of

$21,060. This left expenses of $60,857.13. Plaintiff paid a total of $54,632.10, leaving a deficit of $6,225.03.

In 1979, the expenses of the Association, including escrow, totaled $66,544.64. The owners of completed units paid $38,036 in assessments, leaving expenses of $28,508.64. Plaintiff made payments totaling $43,847.13 for an overpayment of $15,338.49.

During the first four months of 1980, the expenses, including escrow, totaled $28,456. Total assessments during this period to owners of completed units were $17,952. This left expenses of $10,504. Plaintiff, however, during this period, paid a total of $12,616.01, for an overpayment of $2,112.

As we have stated, we are of the opinion that the record supports the Chancellor's finding that plaintiff paid more than its pro rata share of assessments for the years 1977 through 1980.

Defendants further argue that "[n]either the Doctrine of Laches, Acquiesence [*sic*], or Estoppel Could or Should Apply to Bar Any Relief Against the Developer, on Behalf of the Association and All Homeowners."

The Chancellor, in his Memorandum, found as follows:

Although it appears that the financial records of the Homeowners' Association were available for inspection by the owner-occupants, it does not appear that any of the owner-occupants ever sought to examine the books and records prior to the March 1980 "takeover" meeting. The Court concludes that the minority members acquiesced in the Declarant's method of operation of the Homeowners' Association, they being induced to do so by the knowledge that the services and benefits received by them were worth substantially more than the assessments they were paying.

The Association made no claim for "delinquent assessments" until its March 1980 meeting. For the period 1976 to 1980, the Board of Directors of the Homeowners Association approved annual budgets and set assessment rates based on those budgets.

The Association, at its March 1980 meeting, sought to re-write the assessment rates for the years 1976 to 1980. The original assessment adopted by the Board set rates of $36 for two bedroom, $38 for three bedroom, and $40 for four-bedroom units. These same assessments were carried forward in 1977 and 1978. In 1979, the Board of the Association adopted a rate of assessment for completed units of $80 per unit. The Board adopted a rate of assessment for the vacant lots owned by plaintiff of $26 per month. In addition to the $26 per month, plaintiff paid $14 of the assessed rate for each unit of the completed units, thereby reducing the amount paid by the owners of the individual units to $66 per month.

As found by the Chancellor, throughout all of this period neither the Board nor other members of the Association were denied access to the books and records, and there is no evidence that anyone ever asked to see them. In 1979, the record-keeping functions were transferred to Mr. Schmid, one of the unit owners and an officer of the Association.

In *Margate Village Condominium Association, Inc. v. Wilfred, Inc.*, 350 So.2d 16 (Fla.App.1977), a case involving suit to enjoin a condominium association from imposing assessments against a unit owner, the Court stated: "[T]he time to challenge the legality of the assessments is when the assessments are sought to be enforced." *Id.* at 18. In *Plaza Del Prado Condominium Association, Inc. v. Richman*, 345 So.2d 851 (Fla.App.1977), the condominium association was estopped from claiming a lack of compliance for the condominium by-laws by defendant, and the Court stated: "Plaintiff was under a duty to assert itself sooner than one year after defendant's alleged violation of the by-laws." *Id.* at 852.

We are of the opinion that defendants acquiesced in the method of operation of the Association since they felt it was to their advantage to do so.

We next consider whether the Chancellor's award of attorneys fees to both plaintiff's and defendants' attorneys to be paid by an assessment against each of the 149 lots in Mooreland Estates was error.

The Chancellor, in his Memorandum Opinion, stated, in part, as follows:

The reasonable cost of attorneys fees and other expenses incurred by both Declarant and the minority members in litigating the issues covered by this Memorandum are declared to be obligations of the Homeowners' Association to be included in the annual assessment for the year beginning May 1, 1980. The rate of compensation for attorneys on each side of this controversy will be the same and will not be less than $55.00 per hour.

Pursuant to the Chancellor's Memorandum, an order was entered assessing the Association the sum of $10,990 for the services and expense of the Association's attorney and $23,881.43 for plaintiff's attorney for a total of $34,871.43. To pay these fees would require a special assessment of $238 for each of the 149 lots, of which plaintiff would pay an assessment of $18,723.20 and the remaining members of the Association would pay $16,146.76.

■ The general rule in Tennessee is that attorneys fees may not be recovered unless provided for by statute or by contract between the parties. *Goings v. Aetna Casualty & Surety Company*, 491 S.W.2d 847 (Tenn.App.1972). There are exceptions to this rule, such as where there are property or funds before the court which have been protected or preserved by a party, and then his counsel fees may be paid out of the property or fund so preserved. *French, et al. v. Appalachian Electric Cooperative*, 580 S.W.2d 565, 571 (Tenn.App.1978).

In the absence of property or funds before the court, or statute, or contract of the parties, the public policy of Tennessee is opposed to the allowance of attorneys fees of the successful party against the defeated party. *Gillespie v. Federal Compress & Warehouse Co.*, 37 Tenn.App. 476, 265 S.W.2d 21 (1953).

■ In the instant case there is no statute which allows the awarding of attorneys fees, no contractual provision existing between the parties which provides for attor-

neys fees, and there is no property or funds before the Court which have been preserved, either by plaintiff or defendants, out of which attorneys fees may be paid.

The judgment of the Chancellor in awarding attorneys fees is reversed and in all other respects the judgment of the Chancellor is affirmed with costs to plaintiff. The cause is remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P. J. (M. S.), and CANTRELL, J., concur.

## ORDER ON PETITION TO REHEAR

LEWIS, Judge.

Defendants have filed a petition to rehear which the Court has considered but found to be without merit.

We considered each of defendants' arguments in the original Opinion. A petition to rehear which merely reargues petitioners' original position will not be granted. Rule 39(a), Tennessee Rules of Appellate Procedure.

The proper office of a petition to rehear is to call the attention of the Court to matters which were overlooked in the original Opinion, not those matters which counsel supposes to have been overlooked or improperly decided after full consideration.

The instant petition does nothing more than reargue matters previously argued by counsel and considered by the Court. Accordingly, the petition to rehear is overruled.

TODD, P. J. (M. S.), and CANTRELL, J., concur.

## ORDER ON "MOTION TO RECONSIDER"

LEWIS, Judge.

Defendants-appellants have filed a "MOTION TO RECONSIDER," a motion unknown to the Tennessee Rules of Appellate Procedure. We will, however, treat the motion as a motion to rehear.

We most respectfully disagree with appellants' contention that the two orders entered by this Court on April 19, 1982, are inconsistent.

This Court, in its Opinion filed March 26, 1982, assessed costs of the appeal to appellees. Thereafter, appellees filed a motion seeking to have this Court retax the costs to appellants. Appellants filed their motion seeking to recover cost of the transcript as recoverable cost under Rule 40, TRAP.

Orders were entered on April 19, 1982, denying appellees' motion to retax the costs as being without merit and denying appellants' motion to recover transcript cost on the ground that the single issue upon which appellants prevailed was not an issue in which a transcript of evidence or proceedings was required.

This Court is fully cognizant that Rule 40(c), TRAP, provides that "Recoverable costs on appeal include ..., the cost of a transcript of the evidence or proceedings ...."

Rule 40(a) provides:

Except as otherwise provided by statute or these rules, if an appeal is dismissed, costs shall be taxed against the appellant unless otherwise agreed by the parties or ordered by the court; if a judgment is affirmed, costs shall be taxed against the appellant unless otherwise ordered; if a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered; if a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the appellate court.

Appellants take the position that since they prevailed on one issue, any and all costs are taxed against the appellees. The judgment in this case was affirmed in part, reversed in part, and remanded. Costs under these circumstances are allowed only as ordered by the Court. When our Opinion was filed in this cause on March 26, 1982, we did not have before us a bill for the cost of the transcript of evidence or proceedings nor a motion that the cost of the transcript of evidence or proceedings be taxed as a

part of the costs. When appellants filed their motion that the cost of the transcript of evidence be taxed as a part of the costs to be paid by appellee, it was given due consideration and after due consideration, the Court was of the opinion that the cost of the transcript of evidence or proceedings should not be taxed as a part of the costs to be paid by appellees.

Appellants have also complained that the orders of April 19, 1982, were entered with the signature of only one of the members of this Court. Rule 22, TRAP, provides that a single judge of this Court may entertain and may grant or deny any request for relief that under the Tennessee Rules of Appellate Procedure may be sought by motion, except a motion to dismiss or otherwise finally dispose of an appeal.

Appellants' motion is without merit and is dismissed with costs to appellants.

TODD, P. J. (M. S.), and CANTRELL, J., concur.