**Barbara J. GUESS and James A. Guess,
Plaintiffs/Counter-Appellants,**

v.

**Dr. William P. MAURY, Jr., Mid-South Gynecological and Obstetrical Association, a Tennessee Professional Corporation, Defendants/Counter-Appellees.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Aug. 28, 1986.

Rehearing Denied March 9, 1987.

Application for Permission to Appeal Denied by Supreme Court Jan. 5, 1987.

Thomas, Halliburton & Weissman, Memphis, for counter-appellants Guess.

Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, for counter-appellees.

Harris, Shelton, Dunlap and Cobb, Memphis, for Baptist Memorial Hosp.

W.J. Michael Cody, Atty. Gen. & Reporter, and Stephen Nunn, Asst. Atty. Gen., Nashville, for Atty. Gen.-Intervenor.

TOMLIN, Presiding Judge.

This is a medical malpractice case. Plaintiffs are husband and wife. While initially several defendants were named and others subsequently added to the complaint, the case ultimately went to trial against Dr. William P. Maury, Jr. and the Mid-South Gynecological and Obstetrical Association, of which he was a member. In this opinion, plaintiffs may be referred to singularly or collectively. The term "defendant" will refer to Dr. Maury. The gravamen of plaintiff's complaint against defendant was that subsequent to a surgical procedure in July, 1975, the defendant failed to remove a rubber drain tube inserted in the plaintiff's incision to assist healing. Defendant admitted the insertion of the tube, his failure to remove the tube, and that the tube should have been removed by him. At the conclusion of an eight-day trial the jury rendered a verdict in the amount of $950,000 for the plaintiff Barbara Guess and $83,000 for plaintiff James Guess. Defendant timely filed a motion for a new trial which was subsequently argued and taken under consideration by the trial judge, The Honorable Robert Lanier. The order on motion for new trial remitted plaintiff Barbara Guess' judgment to $235,000 and plaintiff James Guess' award to $25,000. All parties have appealed. For the reasons hereafter stated, we reverse the trial court and remand for a new trial.

Plaintiff filed her original complaint against Dr. Maury and Baptist Hospital (referred to hereafter as "Baptist") in February, 1983. She alleged that in July, 1975 she was admitted to Baptist by Dr. Maury. He performed surgery on her, removing her ovaries and ovarian tubes and also performing a bladder suspension. It was alleged that defendant Dr. Maury installed a rubber drain tube in the plaintiff which he failed to remove during post-oper-

ative care. The presence of the drain tube was not discovered until an x-ray examination was conducted, followed by surgical removal of the drain tube in January, 1983. It was further alleged that defendants had negligently permitted the tube to remain in her body. Plaintiff alleged that the presence of the tube during the seven-and-one-half-year period had caused her severe back pain, blackouts, nervousness, mental anguish, physical pain and permanent disability. Plaintiff-husband sought damages for medical expenses, loss of services and loss of consortium.

Answers containing a denial of the charges were filed by all defendants. Plaintiffs later amended their complaint to increase the *ad damnum*. After discovery depositions were taken of defendant Dr. Maury and plaintiffs, defendant Baptist filed a motion for summary judgment on the ground that there was no genuine issue as to any material fact. Plaintiff amended her complaint to include Dr. L.R. Graves, an associate of defendant Dr. Maury, and the obstetrical group of which they were both members. A motion for summary judgment was filed on behalf of Dr. Graves. Plaintiffs also filed a motion for summary judgment as to the issue of liability alone.

In support of Baptist's motion for summary judgment, sworn affidavits were filed to the effect that no medical employees of Baptist had any part in or responsibility for the insertion, care or removal of the rubber drain tube. In addition, the discovery deposition of the defendant Dr. Maury was relied upon. No countervailing affidavits were filed by plaintiffs. At approximately the same time, defendant Dr. Maury and his obstetrical group filed an amended answer admitting that the drain tube Dr. Maury placed in the plaintiff was not removed either during her hospitalization or in any follow-up care, and that the drain tube should have been removed during that time. Defendants again denied, however, that the drain tube caused any of the injuries or damages complained of by plaintiff.

The trial court overruled plaintiff's motion in view of defendant's admitted liabili-

ty. It also overruled the summary judgment motion of Dr. Graves, finding that the responsibility for the drain tube rested with the doctors. Furthermore, the Court granted the motion for summary judgment filed by Baptist, noting that there were no specific allegations in the complaint as to it and that, as already noted, the responsibility for the drain tube rested solely with the doctors, not the nursing personnel of Baptist. By a subsequent consent order, Dr. Graves was dismissed from the suit.

Trial began on February 13, 1985. On February 25, 1985, the last day evidence was presented and the day the jury was charged, plaintiff filed a multi-faceted motion. Plaintiff sought to increase the *ad damnum* on compensatory damages to $1,500,000 and the *ad damnum* on punitive damages to $5,000,000. Moreover, plaintiff sought to bring defendant Baptist back into the lawsuit and to amend the complaint to conform to the proof so as to allege the tort of outrageous conduct, contending a conspiracy existed to conceal from the plaintiffs the discovered drain tube and the damage it caused. The trial court granted the motion to increase the *ad damnum* for compensatory damages but denied the remainder of the motion, stating in part that no charge would be given as to punitive damages.

On February 26, 1985, the jury returned a verdict for the plaintiffs. The following day, plaintiffs filed a motion for attorney fees pursuant to T.C.A. § 29-26-120. The motion was subsequently denied by the trial court. Plaintiff has appealed from that order as well as the order on motion for a new trial.

By their appeal defendants have raised seven issues. As we view them, the paramount issue is whether or not the trial judge erred in ordering a remittitur of the jury verdict rather than granting a new trial. Some of the additional issues raised by the defendants might be considered sub-issues in an ancillary way to this paramount one. In that regard, defendants contend that because the trial judge clearly expressed dissatisfaction with the jury verdict and because the jury verdict was ex-

cessive and beyond the range of reasonableness, a new trial should have been granted.

Defendants contend that improper comments, remarks and statements by plaintiffs' counsel to the jury during the trial inflamed and influenced the jury, as revealed by the size of the verdict, thus mandating a new trial.

(A) Defendants contend the trial court erred in allowing plaintiffs to present to the jury, both in questioning witnesses and in closing argument, an alleged fraud and cover-up theory based upon speculation involving a non-party not presented in any pleadings. As to this issue, defendant contends the evidence inflamed the jury, resulting in an improper verdict.

(B) Defendants contend the trial court erred in allowing plaintiffs to present proof of the standard of care applicable to defendant Dr. Maury after he had admitted liability, and also of the possible incorrect surgical approach used in removing the tube by a doctor who was not a party.

(C) Finally, defendants contend that the verdict was tainted by the statement of plaintiffs' counsel in closing argument, referring to the lawsuit as "a multi-million dollar case," in violation of both the statutory law of the state of Tennessee and repeated rulings by the trial court.

In addition, plaintiffs raise three issues which they contend constitute error by the trial court: (1) the denial of plaintiffs' motion at the close of the trial to reinstate Baptist as a party defendant; (2) the denial of plaintiffs' motion at the conclusion of the trial to amend their complaint to allege the tort of outrageous conduct against the defendant Dr. Maury and Baptist; (3) the denial of plaintiffs' post-trial motion for attorney fees. On appeal for the first time plaintiffs challenge the constitutionality of T.C.A. § 29–26–117. In oral argument plaintiffs' counsel conceded that their challenge was not serious and waived argument on this issue. We thus treat the issue as waived.

Many underlying facts are not in dispute. In June, 1975 plaintiff became a patient of defendant Dr. Maury. She was admitted to Baptist Memorial Hospital on July 14, 1975 as a surgical patient. The following day defendant Dr. Maury operated on plaintiff, performing a laparotomy with a bilateral salpingo oophrectomy (removal of the ovaries and tubes) and a Marshall Marchetti urethral suspension. In addition he cut some adhesions which he found in her pelvic region. It is noted that prior to this surgery plaintiff had been complaining of urinary incontinence. As part of the surgical procedure in connection with the urethral suspension defendant Dr. Maury inserted a small latex rubber drain tube into the surgical area to assist with healing. The end of the tube projected through the incision and was covered by bandages. During the plaintiff's post-operative care the tube was shortened by Dr. Maury's associate. It apparently was not removed in the manner and at the time that it should have been removed and ultimately retracted through the incision into plaintiff's body. This unfortunate occurrence was never discovered by defendant Dr. Maury or his associate.

The drain tube remained in the plaintiff for over seven years. During that time her discomfort and the extent of disability increased. During the few months immediately preceding surgery, plaintiff was experiencing substantial pain and discomfort and was virtually bedridden.

On January 7, 1983 plaintiff, complaining of pain in the pelvic area, sought relief at the emergency room of Baptist. An x-ray was made of her lower abdomen. The x-ray disclosed a foreign body in the pelvis above the pubic bones. She was seen that day by Dr. James Johnson, Chief Resident of the General Surgery Residency at the University of Tennessee Medical School. Dr. Johnson[1] reviewed the x-ray and concluded that the foreign body was most likely a surgical sponge. Plaintiff, being uninsured, was admitted to the hospital that day as a charity patient. She was scheduled for exploratory surgery on the follow-

1. Dr. Johnson was never made a party to this litigation at any time.

ing Monday, January 10, 1983, the next available date an operating room would be open for non-emergency surgery. Dr. Johnson performed exploratory surgery and removed the foreign object which was found to be a rubber tube known in the medical profession as a "Penrose drain." The specific procedure involved in this surgery is well stated in the trial court's thoroughly written Order on plaintiffs' motion for a new trial.

> Dr. Johnson first cut into the peritoneum, found adhesions which he lysed [cut], and then entered the space of Retzius, where he found "plenty" of fibrosis, fibrotic reaction, "adhesions," or scar tissue around the drain. (He admitted that he had stated before the trial that there were "lots of dense adhesions.") He removed the drain and found a hole the size of a dime on top of the bladder, which then leaked urine. He sutured this hole and repaired it. Mrs. Guess suffered nausea and vomiting post-operatively secondary to the anesthesia. She remained in the hospital for two weeks. She was left, of course, with a surgical scar from her navel to her pubic bone. A period of recovery from surgery was required following her operation.

## I. FAILURE OF THE TRIAL COURT TO GRANT A NEW TRIAL.

■ The courts of this state, as well as courts from other jurisdictions, have wrestled for years with the question of the proper method to handle an allegedly excessive jury verdict in a tort case—that is, whether the excessiveness, if such is found to exist, should be disposed of by a remittitur or whether a new trial is dictated. There has been a parade of cases in this state considering the role of appellate courts in passing on the trial judge's use of the options available to him—remittitur, additur, and a new trial—beginning with *Smith v. Shelton,* 569 S.W.2d 421 (Tenn. 1978) to the most current decision of our Supreme Court, *Burlison v. Rose,* 701 S.W.2d 609 (Tenn.1985). In light of what has been written by this Court and the Supreme Court on the subject within a short span of seven years, we see no need

to plow that field again by a case-by-case review.

In our opinion, the cumulative effect of what we have designated as sub-issues to the principal issue of remittitur versus a new trial mandates that a new trial be ordered. A consideration of these issues one by one is in order at this time.

The nature and extent of the damages and injuries sustained by the plaintiffs is relevant to the first of these two sub-issues. In his order on the motion for a new trial, the trial judge clearly and succinctly stated the extent and nature of plaintiff's complaints and damages sustained by the proof:

> Following the 1975 surgery, Mrs. Guess had a three to four inch swollen, inflamed area near her incision which felt like something was sticking her. Defendant gave her pain killers and antibiotics. She saw Dr. Maury for this several times until October 5, 1975. She never fully was able to resume her normal activities, although in later 1975 she seemed to be doing well. In April of 1976 she still felt weak and had "difficulty" and severe cramps in her lower abdominal area and had headaches. At times, bending, lifting, standing or using the vacuum cleaner caused lower abdomen pain like a "spasm." She also had pain in her hips and upper legs. When eating, she had severe cramps or diarrhea after one or two bites of food. This continued from the time of her surgery but became much worse after approximately 1979. She was also unable to retain her urine and sometimes wet her clothes. She wore a sanitary napkin as a diaper. These problems sometimes occurred in public, to her embarrassment. She had to refuse social invitations. Her bowling hobby was somewhat curtailed, and eventually prevented, by her problems. Headaches sometimes became so severe she went to a hospital emergency room for pain injections. She lost weight. She was afraid to eat. She sought help from numerous doctors and underwent gastrointestinal testing, including a proctoscope examination. She

had worsening pain and weakness in her legs from the knee up ever since the surgery. Sexual relations became very uncomfortable and painful and sometimes bleeding occurred. Sex was avoided and eventually ceased. Plaintiff began to require the assistance of a walking cane and, ultimately, a walker in order to be able to walk. She depended, in the years immediately before 1983, on her family for everything because of the increasingly severe pain in her lower abdominal area and upper legs. She became irritable and contemplated suicide. She became unable to drive and stayed in bed or on a couch from October of 1982.

Immediately after surgery, plaintiff's pain was much better. She was hospitalized for two weeks, approximately one week of that time for the treatment of headaches she complained of for several years. Plaintiff continued to improve in the weeks and months that followed. She testified that approximately six to eight months after surgery she had returned to her pre–1975 condition. She engaged in sex regularly and returned to regular full-time employment. At the time of trial she could do all of her household chores, could eat most anything she desired, and from time to time went hunting with her son. She stated that she was back to normal.

As noted in the trial court's Order on motion for a new trial, Mrs. Guess offered no proof of permanent disability and claimed no medical expenses or special damages of any kind other than her lost earning capacity, which was rather vague.

As for the claim of plaintiff's husband, he suffered the loss of consortium consistent with the above-described condition of his wife. In addition to foregoing sexual relations, he had to assume the responsibility of helping around the house and acting as a nurse to his wife. For several years prior to the surgery for the removal of the drain tube, plaintiff-husband had not been employed due to a heart condition.

On the other hand, defendants presented proof seeking to establish that for a quarter of a century plaintiff-wife had been plagued with physical and surgical problems, some of which contributed to her complaints during the period the tube remained in her. In 1962, at age 22, she was hospitalized for back trouble, specifically scoliosis and arthritis. In 1964 she had her cervix removed, along with a bladder suspension. In 1969 she had a hysterectomy. In 1971, at age 30, she underwent a lumbar-laminectomy. That same year she was hospitalized with a complaint of diarrhea, diverticulitis and adhesions, and underwent a cholecystecomy. In 1973 she was hospitalized with diabetes, severe headaches and back pain. Her medical records reflect that she had migraine headaches most of her life. Plaintiff also conceded that she had a considerable amount of diarrhea following her gallbladder operation in 1971.

After considering all the evidence in the record pertaining to plaintiff's damages, following a review of the cases of the appellate courts of this state pertaining to the role of a trial judge considering the excessiveness of a verdict, with emphasis on *Smith v. Shelton, supra,* and its progeny, the trial court noted in its well-written Order that the plaintiff was entitled to a substantial verdict based upon the proof. Then having reviewed the evidence in light of the aforementioned cases, it concluded:

[A] verdict for Mrs. Guess in excess of $235,000, or $25,000 for Mr. Guess, would be excessive. Further, that there would be absolutely no evidence, upon any reasonable view of the case, to support a verdict for Mrs. Guess in excess of $435,000 or for Mr. Guess in excess of $40,000, and any such verdict is beyond the range of reasonableness.

At the same time the trial judge conceded that he had erred in allowing plaintiff to increase her *ad damnum* to over $1,000,-000.

*Smith v. Shelton, supra,* is considered by many to be the bench mark for determining the scope of appellate review of the use by a trial judge of remittitur or additur. *Shelton* states that there needs to be a determination of whether the jury verdict is within the range of reasonableness as established by the credible proof. Although it refers to both the upper and

lower limits of that range, *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125 (Tenn. 1980) clarified *Smith,* stating that if the issue is remittitur only, the determination of the upper level of the range of reasonableness is all that is required.

This Court is aware of the caveat set forth in *Pitts v. Exxon Corp.*, 596 S.W.2d 830 (Tenn.1980), in that the "validity of a finding that a jury verdict evidences passion, prejudice or caprice from the size alone is always suspect and with justification could be characterized as an arbitrary basis for the imposition upon the parties and the judicial system of a new trial." *Id.* at 836. In reaching such a conclusion, Justice Fones stated:

> Finally, an examination of the judicial process necessarily involved in a finding that a jury verdict is tainted by passion, prejudice or caprice, based upon the size of the award alone, requires first, that the line marking the upper limit of the range of reasonableness be established, and second, that the line marking the upper limit of the range of mere excessiveness be established, beyond which, theoretically, would lie the passion, prejudice and caprice range.

*Id.*

In the case at bar, there is no allegation of jury misconduct. As we shall subsequently consider, we are of the opinion that there was misconduct on the part of plaintiffs' counsel which influenced the amount of the verdict, as well as other errors that had a like effect.

We are faced with a finding by the trial court that the upper limit of range of reasonableness for plaintiff Mrs. Guess is $235,000 and for plaintiff husband, $25,000, and that the line marking the upper limit of the range of excessiveness is $435,000 for Mrs. Guess and $40,000 for Mr. Guess.

In our opinion, *Foster v. Amcon International, Inc.*, 621 S.W.2d 142 (Tenn.1981) clarifies and at the same time modifies the guidelines of *Shelton.* The standard of review enunciated by *Foster* is as follows:

> Henceforth the standard of appellate review will be simply to ascertain whether the trial judge's actions in increasing or decreasing a verdict were justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror.

*Id.* at 145.

*Foster* is often cited for the proposition that even when a jury verdict is within the range of reasonableness, as an alternative to granting a new trial the trial judge may suggest adjustments in the verdict. While that aspect of *Foster* is not applicable to the case at bar, we think the result reached in *Foster* and its supporting rationale are applicable here. In *Foster* there was a jury verdict for the plaintiff in the sum of $500. On a motion for a new trial, the trial judge granted an additur to $15,000. In support of this additur, the trial judge stated that "under the proof the verdict is grossly below the lower limits of reasonableness." *Id.* at 148. This statement obviously expressed his dissatisfaction with the jury verdict. The Court of Appeals reversed the trial judge and restored the jury verdict.

In reversing the Court of Appeals, the Supreme Court stated that its review of the evidence supported the Court of Appeals' conclusion that the jury verdict of $500 was within the range of reasonableness and that the trial judge was also justified in suggesting an additur, inasmuch as he found the jury verdict to be inadequate. The Court then stated:

> The additur, suggested in this case however, bears absolutely no relation to the jury's verdict. Additurs and remittiturs were designed to correct the excessiveness or inadequacy of a jury's verdict as an alternative to the granting of a new trial. To suggest an additur thirty times that of the jury's verdict, in our mind totally destroys the jury's verdict.

> The record clearly reveals the trial judge's dissatisfaction with the jury's verdict when he stated that "under the proof the verdict is grossly below the lower limits of reasonableness." It is obvious that in his role as thirteenth juror he would not have accepted a $500.00 verdict, but would have awarded plaintiff

a new trial. We therefore reverse the judgment of the Court of Appeals in reinstating the jury verdict and remand this cause for a new trial.

*Id.*

While the remittitur suggested in the case at bar is not thirty times the verdict, it is substantial, amounting to a seventy-five percent reduction of the jury award. As noted in a footnote in *Foster,* our Supreme Court stated that they did not intend to establish a numerical standard for reviewing additur and remittitur. Nonetheless, we feel the parallel is there.

In the case at bar, the order of the trial judge overruling defendant's motion for a new trial alluded to the possibility of granting a new trial rather than making a suggestion of remittitur. He also showed his dissatisfaction with the jury's verdict when he labeled it "grossly excessive." Without playing games with numbers, we are of the opinion that a remittitur of seventy-five percent destroyed the jury's verdict. We also conclude that in his role as thirteenth juror the trial court would not have accepted the $1,033,000 verdict, but would have awarded plaintiff a new trial.

## II. MISCONDUCT OF COUNSEL.

■ Defendants have also raised as an issue what they submit to be improper comments, statements and arguments made by plaintiffs' counsel in the presence of the jury for the purpose of influencing and prejudicing the jury, so as to affect the verdict. It should be kept in mind in considering this issue that prior to trial defendant Dr. Maury filed an amended answer admitting liability for installing a drain tube in the plaintiff Barbara Guess and failing to later remove it.

The record reflects that the jury, more than a dozen times, was instructed to disregard statements and comments made by plaintiffs' counsel. Another time plaintiffs' counsel was instructed to keep his comments to the jury to a minimum. Many of the objections of defense counsel which were sustained by the trial court were of a repetitious nature relating to questions previously objected to and sustained.

Generally speaking, this Court recognizes the wide discretion given trial judges in the trial of cases before them, insofar as the actions of trial counsel are concerned. It has been held that appellate courts will not interfere with this discretion of the trial court in denying a new trial for misconduct of counsel in argument, unless it is felt that the argument is unwarranted and made for the purpose of appealing to passion, prejudice and sentiment, which cannot be removed by the trial judge's sustaining an objection of opposing counsel, or unless we affirmatively find that such argument affects the results of the trial. *See J. Avery Bryan, Inc. v. Hubbard,* 32 Tenn. App. 648, 225 S.W.2d 282, 287 (1949). While *Hubbard* deals with misconduct of counsel in argument, it also stands as authority for misconduct in the form of questions to witnesses and irrelevant comments to the jury. The bedrock of any trial under our system of justice is that it be fair—fair to the plaintiff and fair to the defendant. The requirement of fairness is neither made more stringent nor diluted by a defendant hotly contesting each and every issue in the trial or admitting each and every issue, including liability and/or damages.

The appellate courts of this state have been known to remand a case for a new trial when they deem that the scales of justice have been tilted improperly in favor of a litigant as a result of the conduct of his counsel. In *Nashville Ry. & Light Co. v. Owen,* 11 Tenn.App. 19 (1929), the Middle Section of this Court found as prejudicial a statement by plaintiff's counsel that defense counsel had made a cowardly attack on plaintiff's moral character, when such a charge was not warranted either by evidence introduced by the defendant or by any conduct of defendant's counsel. A new trial was ordered.

In *Pullman Co. v. Pennock,* 118 Tenn. 565, 102 S.W. 73 (1907), plaintiff sued a sleeping car company for refusing to furnish him accommodations. In his closing argument, plaintiff's counsel stated that defendant was a vast and wealthy corporation with a substantial income and that in a

case almost identical with the one in controversy the jury had awarded $10,000. An objection was sustained and the jury admonished. A second reference to the $10,000 verdict was made and yet a second objection was sustained and counsel admonished.

In reversing the trial court and awarding a new trial, the Supreme Court stated:

It is immaterial that the objection to the improper matter was sustained, and that counsel was reprimanded and fined. The purpose of counsel had been accomplished. The jury had been innoculated with the poison of the foreign matter improperly injected in the case, and every lawyer of experience knows the impossibility of removing the impression that has been made. It cannot be done. No verdict should be allowed to stand where counsel deliberately and persistently inject into the record matter calculated to prejudice the jury against the opposite party and influence the jurors in their deliberations.... The client is responsible for the action of his attorney, and cannot be allowed to reap a benefit improperly obtained by him. The conduct of counsel in this case could not have been intended for any other purpose than to cause the jury to render an excessive verdict; and it is evident, considering the size of that found and the injuries sustained by the plaintiff, that his efforts were successful.

*Id.* at 569–70, 102 S.W. at 74.

*Prewitt-Spurr Mfg. Co. v. Woodall,* 115 Tenn. 605, 90 S.W. 623 (1905) was a personal injury case in which counsel for plaintiff on at least three different occasions sought to bring out before the jury that the defendant had liability insurance. To each question defense counsel posed an objection which was sustained. In closing argument the matter was raised again. Counsel for defendant at once objected and moved for a mistrial. The trial judge sustained the objection but denied the motion, admonishing the jury not to consider that part of the argument. The jury returned a verdict in favor of the plaintiff. In reversing and remanding for a new trial, the court stated:

We regard the present case, in the phase we have been considering, as exceptional in its character, and while, under ordinary conditions, this court will not interfere with the exercise of legal discretion by the circuit judge in the limitations he imposes or refuses to impose upon counsel in the conduct of their cases, and in declining a new trial by reason of such conduct, yet, when we find a persistent abuse of well-established and universally recognized rules of correct practice, it is then our duty to interpose, and to do that which should have been done by him.

*Id.* at 609, 90 S.W. at 624.

A case more in point is that of *English v. Ricks,* 117 Tenn. 73, 95 S.W. 189 (1906). The case was a will contest case. Probate was denied and proponent appealed. One of his grounds dealt with conduct of opposing counsel.

Certain pages of the record referred to by counsel for the proponent ... contain matter which shows that one of the attorneys for the contestants, during the progress of the trial, persistently disregarded the rulings of the trial judge in continuing to ask incompetent questions after they had been ruled out by the judge, and that he likewise persisted in indulging in side remarks, observations upon and criticisms of current testimony, in the presence and hearing of the jury, during the examination of the witnesses, of a character tending to greatly prejudice the proponent's case, thereby getting before the jury much incompetent matter that should never have been stated in their hearing. Although proponent's counsel repeatedly appealed to the court for the protection of his client's interest against this unjust and unlawful practice, and the court repeatedly rebuked contestant's counsel, he did not desist; and so, in substance, though not in words, he refused to obey the reasonable, proper and just rulings of the court, through which it was sought to preserve to the proponent her right to an orderly trial.

The assignment is well founded. If there were no other ground of reversal, we should feel constrained to reverse upon this ground alone. Verdicts so obtained cannot be permitted to stand. Counsel must respect the just authority of the trial court. The parties to a lawsuit are entitled to a fair trial upon the issues presented. Irrelevant matters cannot be persistently injected into the case over the protest of opposing counsel, and in disregard of the rulings of the trial judge, thereby beclouding and prejudicing the minds of the jury. Such conduct on the part of counsel is destructive of that order, decorum, and sobriety which should characterize judicial proceedings, wherein court and counsel are engaged in an effort to ascertain the truth, and to do justice. When the circuit judge, on proper application, fails to grant a new trial for such unlawful practice, this court must and will, when we can see, as in the present case, that it was injurious ... to the rights of the party against whom it was employed.

*Id.* at 77–78, 95 S.W. at 190.

Although finding that the trial judge should have taken stronger corrective action than he did, this Court does not wish to appear overly critical of the trial judge in this regard. This was an eight-day trial. The actions of plaintiffs' counsel complained of were scattered throughout the trial. The case was vigorously fought. It is not easy for a trial judge to recall with clarity each and every occurrence which has taken place during the course of a trial, particularly one of this length. Furthermore, an alleged error of this type is a cumulative one. This Court has the advantage of a transcribed record to review under circumstances absent pressures of trial. We have done that and we conclude that taken as a whole the conduct of counsel was prejudicial to the defendants. We will not lengthen this opinion by reviewing each and every incident observed and complained of, but we note some examples: A question asked of defendant suggested that plaintiff might have been treated differently if she had been a member "of the Germantown set" rather than a charity case. Again, addressing Dr. Maury, referring to the discharge of the plaintiff by one of his associates, counsel commented, "now as luck would have it you were off that weekend."

On another occasion, while cross-examining Dr. Johnson, who performed the second surgery, plaintiffs' counsel made direct comments suggesting a calloused lack of concern for his patients and again suggested that the doctor was unavailable for patients on the weekend because he spent his time on the golf course.

As reflected in the order on the motion for a new trial, the trial judge was equally as concerned about this misconduct as this Court.

As to the behavior of counsel for plaintiff and the attempt to inject irrelevant or unsubstantiated issues into the suit, the Court feels that these matters, though reprehensible, are not sufficient to mandate a new trial. At times the behavior of plaintiff's counsel seemed to spring from a genuine failure to understand the law and the duty of an attorney to assist the Court and jury in reaching a reasoned, dispassionate decision on the real issues. (On one occasion, counsel told the Court, after evidence was ruled irrelevant, that he wanted to present it anyway because one never knows what a jury will find to be important). At other times, after objections were sustained and even explanations and directions were given by the Court, the actions of counsel could not be so charitably viewed.

Were this a close case of liability, or even one in which the plaintiffs' damages were clearly negligible, the court would be constrained to consider most seriously the granting of a new trial without any suggestions of remittitur. However, as previously stated, the Court considers the plaintiff's injuries to be relatively substantial. The jury was instructed that they were not to reward or punish anyone. The verdict, though greatly excessive, does not mandate a new trial, especially in view of the Court's ability to

suggest a proper adjustment to that verdict.

There is nothing in this record to indicate a lack of knowledge and understanding on the part of plaintiffs' counsel. A trial judge has the prerogative and the responsibility to adjust a verdict after evaluating the proof concerning damages. But we know of no method of evaluating a verdict in relation to the degree and extent to which a jury's mind has been prejudiced and confused by irrelevant evidence, comments and remarks of counsel that ultimately affect the fairness of the trial, so as to be able to cure these effects mathematically by an additur or remittitur. Once the fairness of the trial has been affected, the only recourse is to award the complaining party a new trial. We are of the opinion that this issue, standing alone, would mandate a new trial. Considered cumulatively with the other issues presented herein, we have no doubt.

## III. PLAINTIFF'S FRAUD AND COVER-UP THEORY.

■ Defendants contend that it was error on the part of the trial court to allow plaintiffs to present to the jury, in questioning certain witnesses and in closing argument, a speculative theory about an alleged fraud and cover-up. The alleged parties to the purported fraud and cover-up were the defendant Dr. Maury, Dr. Johnson, who performed the surgery, and Baptist Hospital. Dr. Johnson was never made a party by the plaintiffs and Baptist Hospital had been dismissed through summary judgment over a year before trial began.

Early in the trial, defendant Dr. Maury was called as a hostile witness and cross-examined by plaintiffs' counsel. Under cross-examination, defendant detailed how Dr. Johnson had telephoned him after determining from x-rays that a foreign object was in Mrs. Guess and indicated that it might have resulted from the 1975 operation performed by him. Dr. Maury asked that plaintiff be transferred to Baptist East where he then maintained his practice. It was determined that Mrs. Guess was a charity patient, who still owed Baptist Hos-

pital for her previous surgery. In addition, having no insurance she could not be transferred to Baptist East. In a subsequent telephone call to defendant Dr. Maury, Dr. Johnson advised that he was going to take Mrs. Guess as a patient and perform the surgery to remove the foreign object. This was later corroborated by Dr. Johnson. Dr. Maury also testified that he did not go to the hospital where the surgery was performed.

Six days into the trial, subsequent to the above-mentioned testimony of the defendant, plaintiff sought to present evidence of the alleged cover-up. This was denied by the court. Subsequently, plaintiff was allowed to cross-examine Dr. Johnson about talking to Baptist Hospital lawyers in regard to finding the tube in Mrs. Guess, and also about the time frame in which the surgery report was dictated by Dr. Johnson following the operation.

Outside the hearing of the jury, plaintiffs' counsel presented to the court his theory that Dr. Johnson entered the wrong part of the body—the peritoneum—rather than going directly into the space of Retzius, in an effort to conceal the fact that the tube was left in the plaintiff by Dr. Maury. The trial court refused to permit interrogation of any witness on this theory.

It appears to this Court that the more serious damage was done in plaintiffs' closing argument and rebuttal. The court sought to remedy some of the damage by instructing the jury to disregard certain remarks and statements after defense counsel objected to them. Earlier in his closing argument plaintiffs' counsel described the case as "The Anatomy of the Great Coverup," as well as suggesting that an appropriate title would be "Negligence Leads to Fraud at the Hospital." He then proceeded to describe a meeting called by Baptist Hospital which included hospital representatives, representatives of Dr. Maury's group, Baptist Hospital lawyers and other doctors. He alleged that at this meeting it was decided that "something must be done to keep this thing from happening to us, because … they didn't want the lawsuit." Shortly thereafter, counsel

stated that "[i]t was the agreement, the desire, not to pay her just dues that society and they owed her, and so the cover-up plan was then conceived." Counsel then described "the first element to the cover-up is to falsify the X-ray report by the radiologist." The second act of fraud charged by plaintiff in closing argument was that Dr. Johnson didn't tell plaintiff "the whole truth" about the nature of the foreign object in her body. As we read the record, Dr. Johnson was not certain at that time what the nature of the foreign object was. Lastly, plaintiffs' rebuttal argument to the jury alleged that the three-day delay before surgery could be performed was not because January 10th was the first available date for non-emergency surgery, but because "there was still a debate going on amongst the defendants as to how to carry [out] the cover-up." From our reading of the record we can find no evidence to support an argument of this nature.

This issue was presented to the trial court. The court did not treat it lightly, although we feel that it did not attach to it the importance that it deserved. In his Order on the motion for a new trial, the trial judge stated:

> At many points in the trial, lead counsel for the plaintiff insisted, over sustained objections, in adverting to and hinting at a "coverup" or "conspiracy" including defendants, Baptist Hospital and Dr. Johnson, the surgeon who discovered and removed the drain. Counsel for plaintiff was never able to articulate a coherent explanation or rationale for these suggestions, although in closing argument he hypothecated a meeting between defendant Maury and Baptist Hospital personnel to plan a coverup of defendant's negligence and its consequences. He further alleged that, somehow, Dr. Johnson's apparently unnecessary peritoneal surgery was meant to cover up Dr. Maury's earlier negligence.

The trial judge noted that there was a genuine issue as to whether or not there was scar tissue or adhesions in the space of Retzius where the drain was found. The trial judge noted, as have we, that Dr. Johnson, who removed the drain, testified that there were "plenty" of fibroid adhesions in the area and he had previously admitted to the presence of "lots of dense adhesions." The trial judge relied upon this explanation as the reason for permitting the wide latitude of questioning by plaintiffs' counsel. Nonetheless, the trial court noted that:

> Without doubt, plaintiff's counsel often wandered back and forth into the unsubstantiated theories of conspiracy in his questions and attempted proof. Counsel for plaintiff was unable to state any other way in which a conspiracy, even if it existed, affected plaintiff or caused her any damages, since liability was admitted by defendant in his pleadings, well before the trial.

The very first time the fraud and cover-up theory was presented the trial judge should have specifically instructed and directed plaintiffs' counsel that there would be no allusion or reference made to such an alleged cover-up, inasmuch as two of the three parties to it were not before the court and there was a total absence of any allegation or inference concerning same in any of the pleadings.

We are cognizant of the principle of law that admissibility of evidence is within the sound discretion of the trial court, whose decision will be reversed only for abuse of discretion. *Austin v. City of Memphis*, 684 S.W.2d 624 (Tenn.App.1984). However, the courts have likewise stated that even if proffered evidence might be pertinent to issues on trial, it may be excluded where it would (1) inflame or unduly distract the jury, (2) require needless expenditure of judicial time, or (3) unfairly surprise the adversary. *See McCormack v. Riley*, 576 S.W.2d 358, 360–61 (Tenn.App.1978). *McCormack* requires a balancing of the "attendant cost" against any probative weight of the evidence. The court stated that "[t]he most important 'costs' are the dangers of unduly arousing the emotions of prejudice, hostility or sympathy and unduly distracting the jury from the main issue." *Id.* at 361.

Insofar as permitting the interrogation of witnesses on the alleged fraud and cover-up in light of the admission of liability by defendant Maury, the absence of Baptist Hospital and Dr. Johnson from the suit and the testimony of Dr. Johnson regarding the quantum of adhesions found in the plaintiff Mrs. Guess, this line of questioning should have been held to be irrelevant. We deem the remarks made by plaintiffs' counsel in closing argument as quoted earlier to be of an inflammatory and prejudicial nature, and that with the warning that the trial court had already given, should have been prevented. Again, while we cannot say that standing alone these matters would justify a new trial they were certainly improper, and in light of everything else that took place, they add insult to injury and further mandate the new trial that we are ordering.

## IV. "A MULTI–MILLION DOLLAR LAWSUIT."

■ Defendants contend that plaintiffs violated the ruling of the trial court and at the same time influenced and prejudiced the jury by statements made during closing argument.

T.C.A. § 29–26–117 states that "[i]n a medical malpractice action the pleading filed by the plaintiff may state a demand for a specific sum, but such demand shall not be disclosed to the jury during a trial of the case...." In arguing his "fraud" theory to the jury, plaintiffs' counsel stated that "the Baptist[s] knew that they were facing possibly a multi-million-dollar lawsuit...." This was the only time the jury heard any amount of value attached to this case.

Defendants contend that this action on the part of plaintiffs' counsel was in direct contravention of both the trial court's interpretation of this statute and its instructions to counsel. Inasmuch as the validity of the statute has not been put in issue, for the sake of this opinion we assume its validity.

Prior to the *voir dire* of the jury, counsel for defendants advised the court that they were relying upon this particular statute. In response to a question by the court,

counsel for plaintiffs stated his understanding to be that while the *ad damnum* could not be stated to the jury, it did not prohibit plaintiffs' counsel from stating that "this is a case involving several hundred thousands of dollars."

The following colloquy took place between counsel for both parties and the court:

THE COURT: Well, I think the intention of the statute is that a figure not be suggested to the jury, and that's my understanding.

MR. AL THOMAS: If your Honor please, it's my understanding, and I have talked to people who tried cases down in this same Circuit Court, except not in this division, and they have been allowed to state that you can bring back a hundred thousand dollars a year for her pain and suffering, and she has been suffering for ten years, and, therefore, this is a case where it would not be out of line for you to bring back a verdict for a million dollars.

THE COURT: Can you suggest any other purpose for the statute than to—

MR. AL THOMAS: It says you can't read what you sue for.

THE COURT: —suggesting a figure to the jury. I think it's an absolutely absurd law, but it is the law, and the only intention I can gather from it is that you not suggest a figure to the jury, and I would suggest this to you, if you insist on it, and if I were to allow you to do it, it would probably be error, and if you got a judgment, you would be trying this case all over again. So I think it would be wise to avoid that problem, and not make me force you to do it.

MR. IRA THOMAS: Your Honor, if we have the prerogative to take the chance to rule in the area again, I disagree with whether that was the exact purpose—

THE COURT: What do you suggest was the purpose? I'm open to suggestions.

MR. IRA THOMAS: Your honor, the purpose of the medical profession—

THE COURT: No, sir. The purpose of the statute.

MR. IRA THOMAS: No. The purpose of the medical profession trying to lobby a statute through is that, but, you know, if that was the exact meaning, then they would have put in there that there can't be any mention of figures whatsoever in the trial, and, again, the practice has been accepted and allowed even after the passage of that statute in this very Circuit Court, and I have yet to see a case where the Court of Appeals has overturned, or the Supreme Court, and I think Mr. Harvey's very own firm has appealed cases on that very issue, and I have yet to see a reported decision or unreported decision, come out in favor of the defense on that issue, and until it does, it's the plaintiffs' prerogative to take their chance to mention figures, and obviously, when the Supreme Court and the Court of Appeals haven't been overruling, they don't agree with the fact that you can't mention numbers.

THE COURT: Do you know a case in which that question has been raised"

MR. IRA THOMAS: Your Honor, I haven't represented any of the plaintiffs on the cases. I have heard by word of mouth of cases having been appealed. I think we could assume by the fact that I haven't seen any decisions in The Tennessee Attorneys' Memo overruling a case on that basis, we can assume that it hasn't happended, and I do know of many cases by talking to other attorneys that they have mentioned, and to suggest now that the plaintiff doesn't have a right to suggest why they should have any less right than another person to suggest what their damages are worth is an absurd assumption.

THE COURT: All right. The ruling is that you'll make no reference to the amount of money you seek in the lawsuit.

MR. AL THOMAS: No reference to dollar figures at all?

THE COURT: Yes, sir.

MR. AL THOMAS: Is that your ruling?

THE COURT: Yes, sir.

MR. AL THOMAS: And we're precluded from doing so, and if we do—

THE COURT: Of course, you may talk about your special damages, what they are.

MR. AL THOMAS: I understand that, but we cannot say that this is a million-dollar case?

THE COURT: You may not mention the amount you seek.

MR. AL THOMAS: Well, the amount we seek and how much the case is worth, if your Honor please, is two different things. But I don't mean to be argumentative. It's early in the day.

THE COURT: I understand, and I'm fully sympathetic with your position, but I'm not the legislature, and they express the will of the people, presumably, and I can only interpret the statute in one way, and I haven't heard anybody give me any suggestion of any logical meaning other than what I—

MR. AL THOMAS: I want it clear for the record from this standpoint: That you have done more than suggest we not do it, that we might be creating error—

THE COURT: I'm instructing you.

MR. AL THOMAS: You're instructing us not to, and then if we do, it would be a mistrial?

THE COURT: That's correct.

MR. AL THOMAS: So that we are being gagged, so to speak, from any mention of dollar figures.

THE COURT: Yes, sir.

MR. AL THOMAS: Now, we want to note our exceptions to that for the record.

THE COURT: Yes, sir. On the record.

MR. AL THOMAS: And if this verdict comes back for less than a million dollars, and we think that's the reason we can appeal for that.

THE COURT: Yes, sir. You are certainly entitled to do that.

MR. IRA THOMAS: If your Honor would like a suggestion, again, it's a complete difference what people are seeking and—

THE COURT: Once the Court has ruled, you don't continue arguing about it. If the Court is wrong, you have your exception noted on the record.

MR. AL THOMAS: Mr. Halliburton, who also will be trying this case, does want this clarification: We can say, of course, we are suing for a substantial sum of money?

THE COURT: I see no harm in that.

On the last day of the presentation of evidence and prior to charging the jury, the trial judge allowed plaintiffs to increase the *ad damnum* on compensatory damages to $1,500,000, at the same time stating "[t]hat does not change my initial ruling that you may not tell the jury in any way the amount you're suing for."

In the following dialogue counsel for plaintiffs again raised the question of the right to give the jury some figure. We quote the following from the record:

MR. AL THOMAS: If your Honor please, while you're on that, so that I don't commit any error under your Honor's instruction, am I allowed to tell the jury that it's, of course, up to you to decide whether you think that's worth $15,000 a year or $25,000 a year? Now, that's not saying what we sued for, that is mentioning a figure. And I have re-read what your Honor told us on the day of this trial's opening, and, of course, I'm not that smart, but I haven't figured out yet exactly how gagged I am when it comes to mentioning figures.

THE COURT: Well, I don't see anything wrong with—I would say the closer you get to mentioning a figure, the closer you are of violating that statute. And—

MR. AL THOMAS: I understand that, if your Honor please, and I'm willing to take my chances with the Court of Appeals, but I don't want to do anything where Judge Lanier calls me up and says, ["]all right, now, Thomas, that's what I told you, now you've got a mistrial.["] That's why I'm asking you.

THE COURT: Yes, sir.

MR. AL THOMAS: Because I do think that I should be allowed to—It is my understanding that this has been accepted, and I know you're not bound by what other judges down here do, but it's my understanding that this does abound in the other divisions.

As long as I understand from you that I'm not going to get a tap on my shoulder saying ["]that's it, you're out,["] then I'm all right, what I want to do.

THE COURT: I don't think you ought to suggest any figures. Now, if you want to say, rhetorically, you don't know whether it's worth a dollar or a million dollars, that's one thing. But to suggest a worth for it, I think is what the statute forbids.

MR. AL THOMAS: You don't mind my going from one dollar to a million, and that leaves it wide open.

THE COURT: I'm not saying that's what you should say. I'm just saying you can say that—I would stay away from money altogether, if I were you, to comply with the statute.

MR. AL THOMAS: But your Honor is not in a position of trying to get a big verdict out of this jury like I am, and I want to get as much—

THE COURT: I'm in the position of trying to make sure there's no error in this case, as far as I'm able to do that.

MR. AL THOMAS: There would be an error if being gagged too much I don't get the kind of verdict the case demands and should. That, too, would be an error.

THE COURT: I just don't think I would suggest an amount. There's no claim of permanent injury.

As before, the court advised counsel for plaintiffs not to suggest any amount. Nonetheless, in the face of this counsel for plaintiffs persisted in doing so. The trial court interpreted the statute. His interpretation was not challenged on appeal and his instructions to plaintiffs' counsel were clearly violated. At least to some degree the labeling of this litigation as a "multi-million-dollar lawsuit" likely had its effect upon the jury. This is yet another collective reason for a new trial.

In the event this case is retried, certain issues raised by plaintiffs as cross-appellants need to be disposed of. First, plaintiffs complain that the trial court erred in denying their motion to add Baptist Hospital as a party defendant and to amend their complaint to conform to the evidence claimed to be adduced to allege the tort of outrageous conduct to the then-defendants and Baptist Memorial Hospital.

**A.** *The tort of Outrageous Conduct.*
■ Plaintiffs' motion stated that:

Plaintiff would assert that the defendants were guilty of the tort of outrageous conduct, that such outrageous conduct constitutes willful and wanton misconduct on the part of the defendants, and each and everyone of them, that punitive damages are permissible when outrageous conduct has occurred and that plaintiffs should be permitted to so amend their Complaint to conform to the evidence.

The landmark case in this state recognizing outrageous conduct as a tort is that of *Medlin v. Allied Investment Co.,* 271 Tenn. 469, 398 S.W.2d 270 (1966). It stands as sound law today. One of the principles laid down in *Medlin* is to the effect that the actionable conduct for which a defendant is sought to be charged must be set out in the pleadings. "It is not enough in an action of this kind to allege a legal conclusion...." *Id.* at 480, 398 S.W.2d at 275. In their motion, plaintiffs have alleged only legal conclusions.

As was stated in *Nelson v. Ford Motor Credit Co.,* 621 S.W.2d 573, 575 (Tenn.App. 1981):

Liability for the tort of "outrageous conduct" exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury.

*Medlin, supra,* also stands for the proposition that "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id.* at 481, 398 S.W.2d at 275 (quoting Restatement (Second) of Torts § 46 Comment h (1965)). There being nothing alleged for the trial court to properly evaluate, it was not error for it to deny the amendment so as to permit the assertion of the tort of outrageous conduct.

**B.** *Reinstating Baptist Hospital as a Defendant.*

Some six months after the original complaint was filed, Baptist filed a motion for summary judgment alleging that there was no genuine issue as to any material fact, and that it was entitled to a judgment as a matter of law. Its motion for summary judgment was supported by affidavits of members of the staff at Baptist to the effect that the drain tube was installed by defendant Dr. Maury, who as surgeon involved had the responsibility of removing it when its purpose had been served, and that tube-removing procedures were not within the scope of nursing practice. A second affidavit indicated that no hospital intern had ever changed the dressing covering the incision where the drain was inserted nor did any intern provide any treatment to the plaintiff. Yet another affidavit established that Dr. Maury was a private physician and not an employee or agent of Baptist.

The deposition of defendant Dr. Maury, taken by plaintiffs, established that he and his partners routinely changed their patients' dressings. Furthermore, the hospital nurses were not allowed to open the bandages to check the drain. It was the doctor's responsibility to remove the drain. The trial court granted summary judgment in December, 1983 in favor of Baptist, noting that there had been no allegations of negligence as to Baptist. Plaintiffs have not raised on appeal as an issue the granting of summary judgment in favor of Baptist.

It was contemplated by plaintiffs, in conjunction with their motion to add Baptist as a party defendant and to subject it to the charge of outrageous conduct, for the case

to proceed to the jury as to both Baptist and defendant Dr. Maury, notwithstanding the fact that Baptist had not been on trial, had no counsel present and in no way participated in the trial. In its brief, Baptist contended that the practical effect of plaintiffs' motion to put it back into the lawsuit at the eleventh hour and to permit the jury to consider rendering a verdict against it, along with the other defendants, would violate Article I, § 6 of the Tennessee Constitution which guarantees a party's right to trial by jury. With this we agree.

Plaintiffs, also contending in their brief that Baptist submitted false affidavits in support of its summary judgment motion, seek relief in this Court under Rule 60, T.R.C.P. This argument is raised by plaintiffs for the first time on appeal and therefore cannot and will not be considered by this Court. Rule 36(a), T.R.A.P.

■ As to Baptist, we find these issues to be wholly without merit and incapable of relief of any sort by this Court.

In its reply brief to this issue, Baptist moved this Court to declare plaintiffs' appeal as to Baptist a frivolous one. Due to the severity of the claim and exposure presented, it was necessary for Baptist to employ counsel, prepare and file a reply brief and participate in the appeal before this Court.

Insofar as the relief sought by plaintiffs, as the old saying goes, "you can't get there from here." It should be kept in mind that plaintiffs' claim against Baptist had been dismissed through summary judgment. Under Rule 54.02, T.R.C.P., the trial court had the privilege of reversing itself up to and including the date of entry of a final judgment in this litigation. This is particularly true since the order granting summary judgment was never made final under Rule 54.02, T.R.C.P. During the many months following summary judgment, plaintiffs never sought to avail themselves of this relief. The eleventh-hour motion of plaintiffs seeking to assert a new cause of action against Baptist and to add Baptist as a defendant without it having participated in the trial is not the equivalent of a motion to set aside an order of summary judgment. Once a final judgment was entered

below, plaintiffs had a right to raise on appeal to this Court the action of the trial judge in granting summary judgment in favor of Baptist, inasmuch as the order granting summary judgment in favor of Baptist became final at the same time as the final judgment in the lawsuit. Again, plaintiffs failed to avail themselves of this right, and inasmuch as they failed to file a notice of appeal from the order granting summary judgment in favor of Baptist and to present it as an issue on appeal, that judgment has become final.

■ Plaintiffs also seek relief in this Court under Rule 60, T.R.C.P., alleging that the employees of Baptist falsified affidavits filed in support of Baptist's motion for summary judgment. As already noted, this issue was raised for the first time in this Court and therefore cannot be considered. In short, plaintiffs failed to utilize the procedural opportunities afforded them. In lieu thereof, they have presented issues relative to Baptist that have no known basis or foundation in law or in fact. Baptist's motion is well taken. As to it, we hold the appeal to be frivolous. Accordingly, as part of the remand, the trial court is directed to hear proof as to damages that might be awarded pursuant to T.C.A. § 27-1-122 and to award what is found by it to be reasonable.

## V. PLAINTIFFS' CLAIM FOR ATTORNEY FEES.

■ After the trial below had concluded and following filing of notices of appeal, counsel for plaintiffs filed a motion seeking payment to them of attorney fees by defendants pursuant to T.C.A. § 29-26-120, contending that under the statute defendants owed them attorney fees in the amount of $87,333, representing one-third of the judgment after the granting of remittiturs. Counsel for plaintiffs cite no case law nor statute in support of their contention, relying instead on alleged conversations with legislators and/or lobbyists involved with the passage of the Medical Malpractice Act in 1975. We deem these alleged conversations to be insufficient authority.

First, our reading of the statute determines that its obvious purpose is to regu-

late the maximum amount plaintiffs' attorneys may receive from the damages paid. Secondly, the cases we read indicated that in the absence of a statutory provision therefor or a contractual agreement between the parties, the allowance of attorney fees as a part of damages to be recovered is contrary to public policy in this state. *See Springfield v. Hirsch*, 94 Tenn. 425, 29 S.W. 609 (1895); *Gillespie v. Federal Compress & Warehouse Co.*, 37 Tenn. App. 476, 265 S.W.2d 21 (1953); and *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336 (Tenn.1985).

For the reasons above stated, the judgment of the trial court is reversed. This cause is remanded to the Circuit Court of Shelby County for a new trial as to defendants Dr. Maury and the Mid-South Gynecological and Obstetrical Association in accordance with the principles laid down in this opinion. As to Baptist Memorial Hospital, the trial court is directed to fix attorney fees and damages for a frivolous appeal pursuant to T.C.A. § 27–1–122. Costs in this cause are taxed to the plaintiffs for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.